**UNITED STATES of America,
Appellant,**

**v.**

**Marc A. MADISON, a/k/a "Stanley Johnson", Defendant–Appellee.**

**No. 888, Docket 90–1545.**

United States Court of Appeals,
Second Circuit.

Argued Feb. 1, 1991.

Decided June 13, 1991.

---

Jonathan N. Halpern, New York City, Asst. U.S. Atty., for S.D.N.Y. (Otto G. Obermaier, U.S. Atty., S.D.N.Y., Debra Ann Livingston, Asst. U.S. Atty., of counsel), for appellant.

Adina Schwartz, New York City, The Legal Aid Soc., Federal Defender Services, Crim. Defense Div., of counsel), for defendant-appellee.

Before KEARSE, PRATT, and McLAUGHLIN, Circuit Judges.

GEORGE C. PRATT, Circuit Judge:

The United States of America appeals from an order granting defendant Marc A. Madison's motion to suppress statements made by him and "crack" allegedly found in his possession. 744 F.Supp. 490 (S.D.N.Y.1990). The district judge granted defendant's motion because he concluded that the defendant's fourth amendment rights had been violated when he was questioned by a police officer on a commuter bus that was about to depart from its point of origin. For the reasons that follow, we reverse the decision of the district court.

## BACKGROUND

In conjunction with the federal Drug Enforcement Administration, the Port Authority Police Department runs a special drug interdiction program that is designed to restrict the flow of drugs to the areas that surround New York City. In general, the program operates through teams of undercover Port Authority police officers, who engage in surveillance of the commuter bus terminal in the Port Authority bus terminal on 8th Avenue in Manhattan. The officers observe travellers waiting for buses, and if the leader of the surveillance team, after conferring with the other officers, concludes that an individual is acting suspiciously, he approaches the individual, identifies himself as a police officer, and asks whether the individual would answer a few questions and consent to a search of his luggage.

At approximately 12:30 PM on March 9, 1990, such a surveillance team, led by Detective Sergeant Richard Canale, observed defendant Marc A. Madison waiting in line for a bus that was bound for New Brunswick, New Jersey. At that time of day, buses on this route ran every half hour, and the next bus was scheduled to leave at 1:00 PM. According to Canale, Madison caught his attention because Madison "was rocking back and forth in his place on line, and as people passed him by, he would appear to be turning his head to look at those people." Canale continued to observe Madison for another two or three minutes, and then, afraid that Madison might notice that he was under surveillance, Canale moved out of sight and assigned another undercover officer, Detective Elizabeth Danese, to observe Madison.

Passengers began to board the bus at about 12:50. As they did, Canale asked Danese how Madison had been acting. She told him that Madison had continued shifting his weight and "looking at people while he was in line." He clutched his knapsack tightly with both hands. When a man wearing a windbreaker with a New Jersey state police emblem on it walked by him, Madison repeatedly glanced at the man. When a uniformed police officer passed him, Madison stared at the officer until he was out of sight, and, in Danese's words, "became even more animated, his motions became more amplified basically."

Canale decided to question Madison, who had by now boarded the bus. Upon entering the bus, Canale saw Madison sitting in a window seat toward the back, approximately two-thirds of the way down the aisle. When Canale reached Madison, he pulled out his police shield, identified himself, and asked Madison if he "would speak" to him. Madison agreed, and Canale went into the aisle seat behind Madison, leaning his head forward, so that he could look at Madison as they spoke. Danese also boarded the bus; she stood, facing Madison, about two rows in front of him, partially in the aisle. Passengers continued to board the bus. A third detective waited outside the bus. All three detectives were in plain clothes.

Canale asked Madison where he was going and what he had been doing in Manhattan. Madison answered these questions and, when asked by Canale if the knapsack on the seat next to Madison belonged to him, Madison said it did not. Canale asked Madison a second time, and when Madison again denied ownership, Canale loudly identified himself as a police officer and asked if the knapsack belonged to any of the passengers on the bus. When no one claimed the knapsack, Canale asked Madison a third time if it belonged to him; when Madison still denied ownership, Canale opened the knapsack and discovered that it contained crack.

Canale then arrested Madison and removed him from the bus. As soon as he was off the bus, Madison was advised of his *Miranda* rights. He was then taken to Danese's office by the three officers, where he was again informed of his *Miranda* rights. Madison waived these rights and made a number of incriminating statements.

Prior to trial, Madison moved to have the contents of the knapsack and his incriminating statements suppressed. He argued that he had abandoned the knapsack only after he had been seized within the meaning of the fourth amendment and that therefore both the crack found in the knapsack and his post-arrest statements should be suppressed as fruits of an illegal seizure. The government contended that Madison was never seized prior to his arrest, that he willingly and freely answered all questions, and that the search of the knapsack was the result of Madison's voluntary denial of ownership.

The district court concluded that a seizure had occurred at the time that Canale started to question Madison, and that therefore Madison's denial of ownership of the knapsack, the contents of the knapsack, and all of Madison's statements were fruits of the illegal seizure and should be suppressed. In reaching this conclusion, the district court reasoned that:

> [A] reasonable person in Madison's position would not have felt free to leave the bus upon being confronted by Canale and then being questioned by Canale about his residence and travel plans. The bus offered no means for Madison to leave Canale's presence except by disembarking and this was not a reasonable option. * * * Accordingly, * * * under the 'free to leave' test, a seizure had occurred by the time that Canale questioned Madison about his knapsack."

The government appeals, pursuant to 18 U.S.C. § 3731.

## DISCUSSION

■ We must determine whether the defendant, when questioned while aboard a commuter bus that was about to depart from its point of origin, was seized within the meaning of the fourth amendment. Because we conclude that Madison was not seized at that time, we reverse the order of the district court and remand the case for further proceedings.

The district court's factual findings in this case are subject to the clearly erroneous standard. The basic facts, however, are not in serious dispute, and the question of whether a seizure actually occurred "is a question of law subject to *de novo* review." *United States v. Montilla*, 928 F.2d 583, 588 (2d Cir.1991) (citation omitted); *see also United States v. Lewis*, 921 F.2d 1294, 1297 (D.C.Cir.1990).

"Obviously, not all personal intercourse between police and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has restrained the liberty of a citizen may we conclude that a seizure has occurred." *Terry v. Ohio*, 392 U.S. 1, 19, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968). The question we must answer is whether the circumstances surrounding Madison's questioning communicated to a reasonable person "that he was not free to disregard the police presence and go about his business." *Michigan v. Chesternut*, 486 U.S. 567, 576, 108 S.Ct. 1975, 1981, 100 L.Ed.2d 565 (1988) (citation omitted).

It is well-established that "a police officer is free to approach a person in public and ask a few questions; such conduct, without more, does not constitute a sei-

zure." *United States v. Lee*, 916 F.2d 814, 819 (2d Cir.1990) (citations omitted). In determining whether a seizure has occurred, the Supreme Court has clearly stated that the individual's actual freedom must be curtailed. "We adhere to the view that a person is 'seized' only when, by means of physical force or a show of authority, his freedom of movement is restrained." *United States v. Mendenhall*, 446 U.S. 544, 553, 100 S.Ct. 1870, 1876, 64 L.Ed.2d 497 (1980) (plurality opinion of Stewart, J.); *see also Tennessee v. Garner*, 471 U.S. 1, 7, 105 S.Ct. 1694, 1699, 85 L.Ed.2d 1 (1985) ("Whenever an officer restrains the freedom of a person to walk away, he has seized that person."). Factors that "strongly suggest" that a seizure has occurred are "the display of a weapon, physical touching of the person by the officer and language or tone indicating a show of authority that may compel compliance with the officer's request." *United States v. Sugrim*, 732 F.2d 25, 28 (2d Cir. 1988) (citing *Mendenhall*). While this restraint does not have to be physical, it nonetheless must result in a restriction of the individual's autonomy; in general, the cases turn on the degree of voluntariness that an individual maintains in an encounter with police.

For example, in *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), narcotics agents asked for and examined an individual's plane ticket and driver's license, and then, without returning the ticket or license, informed the individual that he was suspected of transporting narcotics and asked the individual to accompany them to a small police room. The Court concluded that these actions together demonstrated a show of official authority such that a reasonable person would not have felt free to leave. *Id.* at 502, 103 S.Ct. at 1326.

In *United States v. Ceballos*, 812 F.2d 42 (2d Cir.1987), we concluded that one of the defendants in that case, Adames, was seized within the meaning of the fourth amendment when he passively obeyed a law enforcement agent's "stern request to accompany him to his field office." *Id.* at 44, 48–49. In reaching this conclusion, we pointed out that at the time he was approached by the agent, Adames was at work, and the agent indicated that he would stay and wait for Adames until he finished his shift. Testifying at trial, the agent admitted that Adames "sensed the urgency" of his request. In addition, when Adames left with the agent, the agent refused to allow Adames to drive his own car to the agent's office; instead, the agent told Adames to get into the agent's car. *Id.* at 44–45.

In both *Royer* and *Ceballos*, law enforcement agents—through words and actions—clearly and unmistakably conveyed that compliance with their requests was mandatory. The individuals who were approached and questioned, while not physically detained, were placed in situations that were "so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded." *I.N.S. v. Delgado*, 466 U.S. 210, 216, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984). Accordingly, their "consent" was invalid, since their actions were in effect compelled.

Unlike the factual situations in *Royer* or *Ceballos*, there was little, if anything, in the actions of Canale that indicated to Madison that he was compelled to cooperate with the officer's questions and requests. Canale quietly approached Madison and asked if he would speak to him. When Madison consented, Canale moved into the seat behind, not next to, Madison's. He did not display his weapon; he did not touch Madison; he spoke to Madison in a "conversational and polite" tone. He did not ask to see Madison's ticket or any identification. The other officer on the bus was detective Danese, who was also in plain clothes; she was approximately two rows in front of Madison, facing him and only partially obstructing the aisle. She never revealed that she was a police officer. People continued to board the bus, suggesting that the bus was not yet ready to depart.

While the actions of Canale were relatively innocuous, the district court was troubled by the location of the encounter.

According to the district court, the confined environment of the encounter intimidated Madison and compelled him to comply with Canale's requests. It was for this reason that the district court concluded Madison was seized within the meaning of the fourth amendment.

In reaching this conclusion, the district court applied what it called a "free to leave" test, pointing in particular to language in *Chesternut:* "[P]olice can be said to have seized an individual 'only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.' " *Chesternut,* 486 U.S. at 573, 108 S.Ct. at 1979 (quotation omitted). The district court concluded that Madison's fourth amendment rights were violated because he could have avoided the police contact only by engaging in behavior that would have been "manifestly contrary" to his interest and "an abnormal departure from the course of conduct" in which he was engaged, *i.e.,* by leaving the bus.

■ In *Royer*, however, the Supreme Court warned that there is not "a litmus-paper test for distinguishing a consensual encounter from a seizure or for determining when a seizure exceeds the bounds of an investigative stop." *Royer,* 460 U.S. at 506, 103 S.Ct. at 1329. The general standard that the district court sought to formulate for evaluating encounters between police and individuals on buses fails to acknowledge the idiosyncratic nature of these encounters. "Given the diversity of encounters between police officers and citizens, * * * the Court has been cautious in defining the limits imposed by the Fourth Amendment on encounters between the police and citizens." *Delgado,* 466 U.S. at 215, 104 S.Ct. at 1762. So, while it is true that in determining whether a seizure occurred, we look not only to "the particular police conduct at issue, but also * * * [to] the setting in which the conduct occurs * * * " *Chesternut,* 486 U.S. at 573, 108 S.Ct. at 1979, nevertheless, location is only one factor in the fourth amendment analysis, and it is not necessarily dispositive.

The district court concluded that a seizure occurs whenever law enforcement officers confront an individual "in confined environments where departure from the government official's presence would require an abnormal departure from the course of conduct in which the individual had been engaged." We cannot adopt this approach, because the district court made two mistakes: first, it confused a reasonable person's belief that he was not "free to leave" (which is critical to a fourth amendment analysis) with "desire to leave" (which has little, if anything, to do with fourth amendment analysis); and second, it incorrectly held the government responsible for a confined environment that it neither created nor forced defendant to enter.

The district court found that in order to break off contact with Canale, Madison would have been forced to engage in conduct that was against his wishes, *i.e.,* he would have had to leave the bus and forego that particular trip on that bus to New Jersey, and that this interference with his "liberty interest in interstate travel" violated the fourth amendment. Significantly, the district court did not conclude that Madison was not actually free to leave the bus, but that by doing so he would have been inconvenienced and may have aroused the suspicions of Canale. However, if Madison could have left the bus and could reasonably have believed that he could have left the bus, then he was "free to leave" for purposes of the fourth amendment. Convenience and desire are not dispositive; rather, the critical issue is whether Madison could reasonably have believed that if he attempted to get off the bus, he would have been prevented from doing so by Canale. Because the district court found that Madison could have gotten off the bus, albeit at the expense of inconvenience and arousing suspicion, he was not physically seized; and because we conclude that he could not reasonably have believed he was not free to get off the bus, he was not seized within the meaning of the fourth amendment.

■ Finally, Madison freely placed himself in the confined environment that the district court found so troubling. Based on an illuminating hypothetical in *Brower v. County of Inyo*, 489 U.S. 593, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989), the Supreme Court noted:

It is clear * * * that a fourth amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement * * *, nor even whenever there is a governmentally caused and governmentally *desired* termination of an individual's freedom of movement * * *, but only when there is a governmental termination of freedom of movement *through means intentionally applied.*

*Id.* 109 S.Ct. at 1381.

*A fortiori*, since defendant's presence in the confined environment in this case was not the result of the officers' actions, the district court was incorrect in finding a fourth amendment violation based on the location where the questioning occurred.

■ The district court concluded that Canale "acted intentionally in deciding to approach Madison on the bus * * * because in an on-the-bus encounter Madison would not have felt free to leave and would be more likely to engage in conversation * * * *" But while Canale may have intentionally waited until Madison boarded the bus to question him, in the expectation that Madison would be more likely to cooperate, this does not constitute a "governmental termination of freedom of [Madison's] movement". *Id.* Canale did not create the confined environment, he merely exploited the situation in which Madison had voluntarily placed himself. Unlike the situation in *Royer*, where government agents created a confined environment, in this case the environment was completely of Madison's selection. And, as the D.C. Circuit has recently held, "[a] bus passenger has voluntarily placed himself in tight quarters, with a single avenue of exit that is narrow and frequently blocked by people and luggage. For this cramped setting, he cannot blame law enforcement officers." *Lewis*, 921 F.2d at 1299.

According to the district court, "[t]he option of leaving the bus * * * was not an option which left * * * [Madison] 'free to disregard the police presence and go about his business.'" (quoting *Chesternut*). Thus, the district court concluded that Canale's actions left Madison "'no choice.'" But Madison's "business" was not to get off the bus, but rather to ride the bus to New Jersey. If he did not wish to have further contact with Canale, he could have simply refused to answer the officer's questions and continued sitting on the bus in silence, waiting for it to depart. Then, if Canale had remained on the bus and refused to break off the "interview", or if Canale had told Madison that if he did not cooperate he was going to be detained or that Canale would prevent the bus from leaving, at that point Madison would not have been free to go about his business and a fourth amendment violation would have occurred. There is no evidence, however, that Canale exerted, or even implied, any of these pressures.

In support of its conclusion that a fourth amendment violation occurs when an individual is confronted in a confined environment where "departure from the government official's presence would require an abnormal departure from the course of conduct in which the individual had been engaged", the district court primarily relied upon *Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), a case involving an automobile stop. However, in *Berkemer* the Court acknowledged that a traffic stop was a seizure within the meaning of the fourth amendment at least partly because motorists do not feel free to ignore a police officer's request to pull over, since in most states to do so would be a crime. *Berkemer*, 468 U.S. at 436, 104 S.Ct. at 3148. The Court pointed out that "the aura of authority surrounding an armed, uniformed officer and the knowledge that the officer has some discretion in deciding whether to issue a citation, in combination, exert some pressure on the detainee * * * *" *Id.* at 438, 104 S.Ct. at 31. The case does not provide a basis for the broader proposition suggested by the district

court, that merely "taking action manifestly contrary to the individual's interest" results in a seizure.

The district court also relied on *Bostick v. Florida*, 554 So.2d 1153 (Fla.1989), *cert. granted*, —— U.S. ——, 111 S.Ct. 241, 112 L.Ed.2d 201 (1990), another bus-search case. However, *Bostick* is distinguishable on its facts. There, two sheriff's officers, "complete with badges, insignia and one of them holding a recognizable zipper pouch, containing a pistol, boarded a bus bound from Miami to Atlanta during a stopover in Fort Lauderdale." *Id.* at 1154. Both officers were wearing "raid jackets". *Id.* at 1157. They picked out the defendant and asked to see his ticket and some form of identification. While they immediately returned the ticket and identification, the officers persisted in questioning the defendant, explaining that they were narcotics agents searching for illegal drugs. They then asked the defendant if they could search his luggage. *Id.* The defendant testified that it was clear to him that the pouch that one of the officers held contained a gun. *Id.* On the basis of these factors, the Supreme Court of Florida concluded that a seizure had occurred, that Bostick's "consent" to the search was therefore invalid, and that the drugs found in the luggage should be suppressed. *Id.* But the factors in *Bostick* that revealed a compelling show of authority—"raid jackets", display of a weapon, a demand for identification, a dramatic, authoritative boarding of the bus at a stop between its points of origin and destination—were all absent in the encounter between Canale and Madison. Thus, even if the Supreme Court should affirm *Bostick*, such a ruling would not be dispositive in this case. Of course, should the Supreme Court reverse in *Bostick* and uphold the search, *a fortiori* the search here should be approved.

Finally, the district court also relied upon several recent decisions of the District Court for the District of Columbia in cases that involved a similar fact pattern. But after the district court's opinion in this case, those cases were reversed by the District of Columbia Circuit Court of Appeals. *See Lewis*, 921 F.2d at 1295. That circuit concluded that in police encounters with individuals on a bus, there is "nothing unconstitutional about such encounters so long as the passengers' freedom to decline the interview and to go about their business has not been restrained 'by physical force or show of authority.'" *Id.* at 1300. We agree.

## CONCLUSION

Because Madison was free and could not reasonably have believed he was not free to go about his business, either by remaining on the bus and declining to cooperate with Canale, or by getting off the bus, he was not seized within the meaning of the fourth amendment. Accordingly, Madison's abandonment of the knapsack was not compelled, and Canale's search of the knapsack and discovery of the crack did not violate the fourth amendment. "When a person voluntarily abandons property * * * he forfeits any reasonable expectation of privacy that he might have had in the property." *Lee*, 916 F.2d at 818 (citations omitted). There then being probable cause for Madison's arrest, and proper *Miranda* warning having been given, Madison's post-arrest statements are also admissible in evidence.

Accordingly, the order of suppression is reversed, and the case is remanded to the district court for further proceedings.