**UNITED STATES of America, Appellee,**

v.

**Lenora J. THOMPSON, Defendant–Appellant.**

**No. 965, Docket 90–1572.**

United States Court of Appeals, Second Circuit.

Argued March 13, 1991.

Decided July 30, 1991.

Henriette D. Hoffman, The Legal Aid Soc. Federal Defender Services Unit, New York City, for defendant-appellant.

Paul A. Engelmayer, Asst. U.S. Atty., New York City (Samuel Whitney Seymour, Asst. U.S. Atty., Otto G. Obermaier, U.S. Atty., S.D.N.Y., of counsel), for appellee.

Before TIMBERS, NEWMAN, and WALKER, Circuit Judges.

WALKER, Circuit Judge:

Lenora J. Thompson appeals from a judgment of conviction entered in the United States District Court for the Southern District of New York (Leonard B. Sand, *Judge*) on June 27, 1990, following her conditional plea of guilty to a charge of possessing more than 100 vials of cocaine with intent to distribute, in violation of 21 U.S.C. §§ 812, 841(a)(1), and 841(b)(1)(C). On appeal, she challenges the denial of her motion to suppress the cocaine taken from her luggage at the time of her arrest and her post-arrest statements, arguing that when police officers questioned her on a train as it stood in a station before departure, their actions constituted a Fourth Amendment seizure unsupported by reasonable suspicion. We hold that in the circumstances of this case, no Fourth Amendment seizure occurred, and we therefore affirm the decision of the district court without considering the reasonable suspicion argument.

## BACKGROUND

On February 5, 1990, Louis Coiro, a criminal investigator with the Amtrak Police Drug Enforcement Unit, and Steven Goldstein, captain of the Amtrak Police Drug Enforcement Unit, were on duty in the ticket concourse of Pennsylvania Station in New York City. Lenora Thompson walked through the station carrying a flowered canvas bag and accompanied by a teenaged male. The officers testified that Thompson's companion nervously looked and twirled around, then veered away from her

as she approached the ticket windows. They also testified that Thompson made "quick jerky movements" and repeatedly turned to look towards her companion, from whom she maintained some distance while descending towards the train platform. Thompson boarded the train and took a seat in the last row of the rear car, placing the canvas bag by her feet. Her companion had already seated himself on the opposite side of the car a few rows ahead of her. The train was scheduled to depart in twenty minutes.

The officers approached Thompson. Investigator Coiro stood behind Thompson, against the back wall of the vestibule storage area in the rear of the car. Captain Goldstein positioned himself in the aisle alongside Thompson's seat. Both officers wore plainclothes; their guns were hidden.

Captain Goldstein identified himself as a police officer, displayed his police credentials and asked Thompson if she would speak to him. Thompson nodded her head in the affirmative, and then answered "yes" when Goldstein repeated the question. Goldstein asked her if she was traveling alone or with a companion; she said that she was alone. When he asked her destination, she replied that she was going to Baltimore, and showed him her ticket after he asked to see it. When Goldstein asked her if she had any luggage, Thompson replied that she did not. Goldstein then pointed to the canvas bag at her feet and asked if it was hers. Thompson responded that it was not. After she denied having luggage for the third time, Goldstein picked up the canvas flowered bag he had seen her carrying and held it over his head, announcing as he walked down the aisle that he was a police officer and that he wanted to know if anyone owned the bag. Approximately ten other passengers sat in the car. No one responded. Thompson appeared nervous and quivering. Goldstein then opened the bag to find vials of white powder. He arrested Thompson. All of this occurred while the train remained in the station. The officers took Thompson to the Amtrak police office in the station and read her Miranda rights. She thereafter stated that she was to be paid $400 for delivering drugs to Baltimore and that she did not know the amount of drugs she was carrying. A field test of the white powder indicated that it was cocaine.

Judge Sand found that there was conflicting testimony as to when Coiro approached Thompson's traveling companion. Coiro testified that he arrested the young man after Goldstein had opened Thompson's bag. Thompson testified that Coiro approached the young man and pushed him back into his seat as Goldstein questioned her about her luggage. Judge Sand did not resolve this dispute, noting that "even if one accepts the defendant's version, she made her observation after she had stated that she was traveling alone, a statement which the officers knew to be untrue."

Thompson moved to suppress the vials of cocaine seized at her arrest and her statements to the officers. On May 23 and May 25, 1990, Judge Sand held a suppression hearing to determine whether the seizure had been illegal and, if it was, whether Thompson's confession was an inadmissible product of the unlawful seizure. At the hearing, Thompson testified that during the time of the questioning, Goldstein spoke to her in a normal voice, although he had "a little firmness in his voice" when he repeated the questions. Both Thompson and the two officers testified that neither officer touched her or displayed weapon. Thompson further testified that except for when Goldstein showed her his badge and leaned down to pick up her luggage, the officers neither hovered over her nor blocked the aisle. Based on this testimony, Judge Sand found that Thompson's access to the aisle was not physically impeded by either officer during the critical phases of her questioning. He further found that although Thompson had testified that she did not feel free to leave when the officers began to question her, it was her own nervousness and not the conduct of the officers that led her to such a conclusion. Finding that "no rights of the defendant were violated by the procedures followed by the arresting officers," Judge Sand denied the motion to suppress.

Thompson entered a guilty plea pursuant to an agreement under which she reserved the right to appeal the denial of the suppression motion, and if successful on appeal, to withdraw her guilty plea. On September 10, 1990, Judge Sand sentenced Thompson to 21 months' imprisonment, a three year term of supervised release and a mandatory $50 assessment.

Thompson now appeals Judge Sand's denial of her motion to suppress her post-arrest statements and the cocaine found in her canvas bag.

## DISCUSSION

Thompson's sole argument on appeal is that the district court erred in denying her motion to suppress because she "was subjected to an investigative stop" unsupported by reasonable suspicion. Specifically, she argues that the train setting "inevitably creat[ed] a special form of subtle coercion." We agree with the district court, however, that Thompson was not subjected to an investigative stop.

■ As the Supreme Court recently explained, "a seizure does not occur simply because a police officer approaches an individual and asks a few questions." *Florida v. Bostick*, — U.S. —, —, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991). Rather, "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968). Even if officers have no basis to suspect an individual, they may generally ask him questions, *see, e.g., INS v. Delgado*, 466 U.S. 210, 216, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984), request to examine his identification, *see, e.g., id.*, and ask for consent to search his luggage, *see, e.g., Florida v. Royer*, 460 U.S. 491, 501, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (1983) (plurality opinion), as long as they do not convey a message that compliance with their requests is required. *Bostick* at —, 111 S.Ct. at 2386.

■ At the outset, in light of the Supreme Court's decision in *Bostick*, we reject Thompson's contentions that the confining nature of the train necessarily transformed her questioning into a seizure because it "inevitably creat[ed] a special form of subtle coercion" and that police officers must have more of a basis for approaching a suspect in a confined setting than in an open area.

In *Bostick*, the Supreme Court rejected the Florida Supreme Court's determination that an encounter on a bus between police officers and defendant Bostick automatically constituted a seizure because Bostick could not have felt "free to leave" in the confines of a bus. While the particular events in *Bostick* involved a bus, the Court emphasized that its Fourth Amendment inquiry "applies equally to police encounters that take place on trains, planes, and city streets." *Id.* at —, 111 S.Ct. at 2388.

■ Although the Supreme Court in determining whether a seizure occurred has sometimes focused on whether a "reasonable person would have believed that he was not free to leave," *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980), in *Bostick*, the Court remarked that the "free to leave" test makes little sense within the confines of a bus, and that courts instead must focus on the "principle that those words were intended to capture." *Bostick* at —, 111 S.Ct. at 2387. The relevant issue must be whether the police conduct was coercive; a defendant's decision to take a confining form of transportation does not bear on that issue. *Id.* Thus, the precise test of whether an investigative stop implicating Fourth Amendment protections takes place is "whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." *Id.* That a defendant was a passenger on a bus is but "one relevant factor" in determining whether an investigatory stop occurred. *Id.* at —, 111 S.Ct. at 2388; *see also United States v. Madison*, 936 F.2d 90 (2d Cir.1991) (decided shortly before *Bostick;* no seizure despite bus setting).

Applying the test of whether a reasonable person in Thompson's situation would have felt free to decline the officers' requests or otherwise terminate the encounter, we find that the record of the suppression hearing abundantly supports Judge Sand's conclusion that no investigatory stop occurred in this case. In this analysis, we apply a clearly erroneous standard to the district court's findings of fact. *Madison* at 92. However, the question of whether a seizure actually occurred is a question of law subject to *de novo* review. *Id.* (quoting *United States v. Montilla*, 928 F.2d 583, 588 (2d Cir.1991)).

Traditionally, there are certain factors which may indicate that a seizure has occurred: "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (Stewart, J.); *United States v. Moreno*, 897 F.2d 26, 30 (2d Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 3250, 111 L.Ed.2d 760 (1990). None of these factors is present here. Only Captain Goldstein approached Thompson, while Coiro remained in the vestibule behind her. Neither officer touched Thompson; both concealed their weapons and wore plainclothes. Furthermore, Goldstein spoke in a conversational and polite tone. Nor is the fact that this encounter occurred on a train a significant factor that alters our conclusion. Judge Sand found, supported by Thompson's own testimony, that the aisle was not blocked during the relevant times of her questioning. Based on these factors, we conclude that the officers did not coerce Thompson in a way that would have led her reasonably to believe that she was not free to decline their requests or otherwise terminate the encounter. We therefore hold that Thompson was not seized within the meaning of the Fourth Amendment. Because of our holding, we need not consider Thompson's further contention that the officers lacked the reasonable suspicion required for a Fourth

Amendment seizure. *See Madison*, 936 F.2d at 96. Since there was no Fourth Amendment seizure, reasonable suspicion was not required.

We note that the result we reach would be the same no matter which version we credit of the disputed testimony regarding when Coiro approached Thompson's companion. Thompson testified that Coiro pushed her companion into his seat just *before* Goldstein questioned Thompson about the canvas bag, not after. Officer Coiro testified he approached Thompson's companion after she had abandoned her luggage and Judge Sand did not resolve this dispute, noting that "even if one accepts the defendant's version, she made her observation after she had stated that she was traveling alone, a statement which the officers knew to be untrue."

We agree with this assessment. Even if we accept Thompson's testimony, and assume, without deciding, that on this version of the facts she was seized for Fourth Amendment purposes at the moment that Coiro approached her companion, such a seizure would not have violated the Fourth Amendment. By that point in the conversation, Thompson had already lied to the agents by saying that she was traveling alone. This statement, which the officers knew to be untrue, together with other circumstances the officers had observed—Thompson's nervous behavior, frantic gestures, circumlocutions about the station, and attempts to hide the fact that she was traveling with another person—provided the officers with reasonable and articulable suspicion to warrant her detention. *See United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889 (1968) (officer may "stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot' "); *Sokolow*, 490 U.S. at 9, 109 S.Ct. at 1586 (evaluated alone, facts known by police may be "quite consistent with innocent travel," but "taken together they amount to reasonable suspicion"). There-

fore, on either version of the facts, no Fourth Amendment violation occurred, and Thompson's abandonment of her luggage was not tainted. *See United States v. Moskowitz,* 883 F.2d 1142, 1149 (2d Cir.1989) (defendant's abandonment of luggage after he was seized was valid and search of luggage did not violate Fourth Amendment).

Affirmed.