UNITED STATES of America

v.

Johnny DELGADO, Defendant.

No. CR–91–122S.

United States District Court,
W.D. New York.

Sept. 27, 1991.

Dennis C. Vacco, U.S. Atty. by Thomas S. Duszkiewicz, Asst. U.S. Atty., Buffalo, N.Y., for U.S.

John V. Elmore, Buffalo, N.Y., for defendant.

## DECISION AND ORDER

SKRETNY, District Judge.

Defendant Johnny Delgado is charged in a one count indictment with possession with intent to distribute a controlled substance. He moves pursuant to Fed. R.Crim.P. 12(b)(3) to suppress physical evidence seized from and statements made by him. This Court held a hearing on defendant's motion on June 25, 1991.

For the reasons articulated below, defendant's motion is granted in part and denied in part.

## FACTS

On May 6, 1991, at approximately 4:05 p.m., Border Patrol Agent Gregory J. Barbagallo was working at the Amtrak Passenger Rail Station on Exchange Street in Buffalo, New York (the "train station"). Agent Barbagallo described the train station at the hearing as "a small brick building, approximately thirty feet by sixty or seventy feet long." Arriving passengers need not enter the building but may leave the train and proceed directly to the parking lot. (Transcript of proceedings before Hon. William M. Skretny, June 25, 1991, (hereinafter, "T"), at 5–6).

Barbagallo was standing in the parking lot of the train station observing passengers disembarking from a westbound train that originated in New York City and had just arrived at the train station. (T at 5–6). Barbagallo was dressed in a green Border Patrol uniform and was carrying a gun, which was clearly visible. (T at 8–9; 36–37). Barbagallo testified that defendant got off the train and when Barbagallo looked in defendant's direction, defendant was staring at him. (T at 7). After answering an inquiry from another passenger, Barbagallo again observed defendant staring in his direction. Defendant then went to the front of the train station toward a pay phone located outside the building. (T at 8–10). Barbagallo walked around the building to his marked Border Patrol car, which was parked in the first parking spot next to the pay phone, approximately eight to ten feet away from it. (T at 10; 19). When he arrived at his patrol car defendant was on the telephone apparently making a call. Barbagallo waited next to his car for approximately fifteen to twenty seconds and after defendant hung up he gave Barbagallo and his patrol car "a quick glance." (T at 11).

Defendant then approached one of approximately three or four already occupied taxicabs located directly alongside the main entrance to the train station. (T at 10; 30–31). Barbagallo overheard defendant tell the driver that he wanted to go to Rich Street in Buffalo. The driver responded that he already had a fare, whereupon defendant stated that he was in a hurry and wanted to take the cab anyway. The driver explained that if defendant wished to take the cab, the driver would first have to take his other passenger to a location on the opposite side of the city and could then take defendant to Rich Street. Defendant said he would go with the cab. (T at 12–13).

Barbagallo then approached defendant, identified himself as a United States Border Patrol agent and asked to speak with him. (T at 13; 34). Defendant responded that he would. Barbagallo asked defendant his place of birth and his citizenship. Defendant responded that he was a United States citizen. (T at 13–14). Barbagallo then asked defendant for some identification. Defendant placed a duffel bag he was carrying at his feet and produced from his wallet an identification card with his name and photograph on it. Barbagallo noted that the card was not issued by a government agency and he testified that he could not determine whether it was authentic. (T at 14–15). Barbagallo asked for further identification, whereupon defendant produced a copy of a birth certificate which bore the same name and date of birth as the identification card, and indicated that the subject was born in the United States. (T at 44). Barbagallo testified that while "it looked authentic," he was concerned with its authenticity because it had been issued well after the date of birth indicated on the certificate. (T at 15–17). Also, Barbagallo recalled that defendant appeared very nervous during their encounter and "[w]hen he [defendant] handed me the birth certificate, his hands were shaking very bad and he could hardly open up the birth certificate in order to let me observe it." (T at 17). Barbagallo further testified on cross examination that defendant possibly produced a Social Security card, but that Barbagallo could not recall for sure. (T at 49). Barbagallo noticed that defendant spoke with an accent, but he could not tell what type of accent it was. (T at 32). Barbagallo conceded, however, that after he spoke with defendant, it appeared to him that English was his primary language. (T at 25; 46).

Barbagallo then asked defendant if he had any further identification in the bag he was carrying. Without responding, defendant looked down at the bag. (T at 17–18). Barbagallo asked for permission to "... look in the bag for any identification." (T at 18). Defendant responded that he was in a hurry. Barbagallo then told defendant that he would "... greatly appreciate look-ing in the bag," (T at 18), but that defendant did not have to comply with his request. (T at 61). Without responding, defendant began to unzip the bag. Barbagallo, concerned for his own safety and in order to better enable him to view the contents of the bag, asked defendant to place the bag on the trunk of the patrol car. (T at 18). Defendant did so and began to remove the contents of the bag. (T at 19). Defendant removed a pair of pants from the bag, unrolled them and placed them on the trunk of the car, at which time Barbagallo heard a "... very, very faint thud ... like something was heavy in the pocket...." (T at 20). Barbagallo testified that he then "... happened to look at the pants and noticed something in one of the pockets. I could see a piece of brown paper." (Id.). Barbagallo asked defendant what was in the pocket and defendant responded that he did not know. (Id.). Without asking defendant if he could touch the brown paper, (T at 57), Barbagallo then "... reached in the pocket and felt the object and noticed it was firm to the touch and asked him [defendant] if I could remove it, and he said no and became very excited." (T at 20). Barbagallo testified that he then told defendant that he believed that the bag in the pocket contained a controlled substance, patted defendant down and placed him in the back seat of the patrol car. (T at 21). Barbagallo testified that at this point, defendant was not free to leave. (T at 59).

Barbagallo then went to the pay phone, called the Drug Enforcement Administration office and requested assistance. He also phoned the Border Patrol Office and was told that a drug dog was unavailable. (T at 22). After approximately ten minutes, Buffalo Police Officer Patrick Judge and New York State Police Investigator Joseph Migliore, both of whom were assigned to the DEA, arrived at the train station. (T at 22).

Officer Judge also testified at the suppression hearing. Judge and Migliore arrived at the train station and conversed with Barbagallo, who advised them of the situation. Defendant was seated in the

back seat of Barbagallo's patrol car. (T at 70). Defendant's blue nylon gym bag was on the trunk of the car, along with a number of items of clothing. Judge noticed a brown paper bag, approximately four by eight inches in size, approximately one-third of which was then sticking out of one of the pockets of a pair of pants. (T at 70). He touched the package with his hand and felt it to contain a solid object. Judge testified that he believed the bag to contain cocaine. (T at 71).

Defendant was then taken to the DEA office. (T at 71). Once at the office, defendant was taken to a processing room. Judge testified that at this point defendant was not under arrest. However, Judge also testified that defendant was not free to leave. (T at 78). Judge asked defendant "... if we could look inside the brown paper bag." Defendant said no. (T at 72). Judge then told defendant that he believed that the bag contained cocaine and that they were going to apply immediately for a search warrant. At some point while defendant was at the DEA office, Judge believes he told him that they had a dog capable of detecting cocaine. (T at 76). Either Judge, Migliore or both then asked defendant again if they could look into the bag before they applied for the search warrant. Defendant said yes. (T at 72). Inside the package was a square object wrapped in duct tape. Inside the duct tape was coffee and inside the coffee was a clear plastic bag containing a substance on which Migliore performed a field test. The substance tested positive for the presence of a controlled substance. (T at 73). Defendant was then advised of his *Miranda* rights, first by Migliore and then a few minutes later by Judge. Defendant acknowledged that he understood his rights. (T at 74).

Defendant then waived his rights and told Judge and Migliore that he was from New York and that he had been paid to deliver the package to an individual named Ricky Santana. (T at 75; 81). Defendant agreed to cooperate and attempt to deliver the package to Santana. Defendant telephoned an individual who Judge and Migliore believed was Santana and arranged to meet him at the train station. Surveillance was set up at the train station but Santana never arrived. (T at 75). Apparently, defendant at some point made a second telephone call to this same individual and arranged to meet him "... at the same place he had met him before on Delaware Avenue." (T at 83). Evidently, this attempted delivery also failed.

At approximately 7:00 p.m., Judge and Migliore obtained from defendant a signed written statement, stating, *inter alia*, that he had agreed with Santana to deliver a package which he believed to contain cocaine in exchange for $600.00.[1]

## DISCUSSION

Defendant characterizes his initial encounter with Barbagallo as a investigative stop justified by Barbagallo's reasonable suspicion that defendant was an illegal alien. Thus, defendant apparently concedes that such stop was permissible under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and its progeny. However, defendant argues that Barbagallo's initial suspicions were allayed when defendant produced identification appearing to show that he was a citizen of the United States and Barbagallo concluded that defendant's primary language was English. Thus, Barbagallo's continued detention of defendant after this point was an impermissible seizure under the Fourth Amendment and defendant's alleged consent given at the train station to search his bag and at the DEA office to open the package was not free and voluntary. Further, defendant argues that any statements made by him (both before and after *Miranda* rights were administered) constitute statements made during an illegal detention and should be suppressed.

---

1. Defendant's written statement was neither offered nor admitted into evidence at the hearing. This Court requested and obtained a copy of the statement from the government. The statement is attached to this Decision and Order as Exhibit A and is thereby made a part of the record herein.

The government argues that the initial contact between defendant and Barbagallo was a consensual encounter requiring no objective justification. Further, the government argues that at the time defendant consented to the search of his bag at the train station, Barbagallo had reasonable suspicion to justify his continued detention. Finally, the government argues generally that none of defendant's statements should be suppressed because they were not the product of custodial interrogation. The government did not argue in its papers or at oral argument that probable cause to detain defendant existed at any time during the events in question.

### The Initial Encounter

■ I find that the initial encounter between defendant and Barbagallo was consensual. Not every encounter between a police officer and a citizen is a seizure implicating the Fourth Amendment. *Terry v. Ohio, supra,* 392 U.S. at 19, n. 16, 88 S.Ct. at 1879, n. 16. "Certainly, a police officer is free to approach a person in public and ask a few questions; such conduct, without more, does not constitute a seizure." *United States v. Lee,* 916 F.2d 814, 819 (2d Cir.1990), citing *Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 1323, 75 L.Ed.2d 229 (1983). The Supreme Court recently stated:

> We adhere to the rule that, in order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter.

*Florida v. Bostick,* —— U.S. ——, 111 S.Ct. 2382, 2389, 115 L.Ed.2d 389 (1991). Thus, the inquiry in determining whether a seizure has occurred must focus on whether the police conduct was impermissibly coercive. *United States v. Thompson,* 941 F.2d 66 (2d Cir.1991), citing *Florida v. Bostick, supra.* To constitute a seizure, the restraint of an individual "... must result in a restriction of the individual's autono-

my; in general, the cases turn on the degree of voluntariness that an individual maintains in an encounter with police." *United States v. Madison,* 936 F.2d 90, 93 (2d Cir.1991). Examples of circumstances which indicate that a seizure has occurred include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's requests might be compelled." *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980). *See also United States v. Madison, supra,* 936 F.2d at 93.

In this case, the circumstances of Barbagallo's initial encounter with defendant were not so coercive so as to communicate to defendant that he was not free to decline Barbagallo's requests for information or to terminate the encounter. Barbagallo alone approached defendant and asked if he would speak with him. Defendant agreed. Consistent with his duties as a Border Patrol Agent, Barbagallo asked defendant his citizenship and asked for identification. Such conduct does not constitute a Fourth Amendment seizure. *See INS v. Delgado,* 466 U.S. 210, 219–220, 104 S.Ct. 1758, 1764–65, 80 L.Ed.2d 247 (1984). Further, although Barbagallo was visibly armed, he testified that he did not have his hand on his gun as he was talking to defendant and there is no evidence that he displayed it in a threatening manner. (T at 37). No evidence suggests that Barbagallo physically touched defendant.

Considering all the circumstances, this encounter is less coercive than other police/citizen encounters which courts have held not to be seizures within the meaning of the Fourth Amendment. *See e.g. Florida v. Bostick, supra,* 111 S.Ct. at 2384–85 (defendant had not been seized when two officers with badges boarded a bus about to depart, identified themselves as narcotics agents, questioned defendant (a passenger on the bus), inspected his ticket and identification, requested his consent to search his bags and found contraband.); *United States v. Madison, supra,* 936 F.2d at 91–92 (no seizure had occurred where

two officers boarded a bus, one of them sat behind defendant and questioned him as the other stood in the aisle in front of him and the first officer then searched his knapsack after defendant denied it was his). *See also United States v. Moreno,* 897 F.2d 26, 31 (2d Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 3250, 111 L.Ed.2d 760 (1990) (transformation of consensual encounter into seizure requires "imposing or intimidating presence.").

Therefore, I find that defendant's initial encounter with Barbagallo was consensual.

*Defendant's Consent to the Search of His Bag*

■ Likewise, I find that defendant consented to Barbagallo's request to search his bag. Whether defendant's consent was voluntary depends on whether it "... was the product of an essentially free and unconstrained choice ..." by defendant. *United States v. Arango–Correa,* 851 F.2d 54, 57 (2d Cir.1988).

Defendant first responded to Barbagallo's request to search the bag for identification by stating that he was in a hurry. However, when Barbagallo stated that he would "greatly appreciate looking in his bag," defendant silently began to unzip it. (T at 18). Despite his persistence, Barbagallo at no time indicated that compliance with his request was mandatory. In fact, he informed defendant that he did not have to allow a search of the bag. (T at 61). Given those circumstances, I find that defendant freely and voluntarily consented to Barbagallo's initial intrusion into his bag.

However, Barbagallo exceeded the scope of defendant's consent when he reached into the pants pocket to touch the package. Barbagallo testified that he specifically asked defendant if he could "... look in the bag for any identification." (T at 18; 50). Because this was the announced purpose of the search, the scope of defendant's consent was so limited. Such limitation on the scope of defendant's consent is further demonstrated by defendant's express refusal to allow Barbagallo to remove the

object from the pants pocket after he had touched it. (T at 20).

This is not an instance where a "suspicious object" came into plain view during the course of an otherwise legitimate search. *See United States v. Moreno,* 897 F.2d 26, 32 (2d Cir.1990). It is true that Barbagallo's initial intrusion into the gym bag was justified by defendant's consent and his initial viewing of the "piece of brown paper" protruding from the pants pocket was inadvertent. This satisfies the first two parts of the three-part test set forth in *United States v. Barrios–Moriera,* 872 F.2d 12, 15–16 (2d Cir.), *cert. denied,* 493 U.S. 953, 110 S.Ct. 364, 107 L.Ed.2d 350 (1989). However, the third part of the test requires the police to have had probable cause to believe that the item seized was evidence of a crime. More precisely, to satisfy this third part, "it must have been 'immediately apparent' to the officer before seizing the item, not after seizing it, that it was of a criminal character...." *Barrios–Moriera, supra,* 872 F.2d at 16, quoting *Coolidge v. New Hampshire,* 403 U.S. 443, 466, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971). Until Barbagallo impermissibly reached into the pocket to touch the object, he did not possess even reasonable suspicion, let alone probable cause, to believe that the object in the pocket was evidence of a crime.[2] It was not until after Barbagallo engaged in the "unlawful rummaging" of the contents of defendant's bag, *Barrios–Moriera, supra,* 872 F.2d at 16, that he claims to have concluded that the package contained a controlled substance. (T at 21).

*Detention of Defendant*

Barbagallo next detained defendant by placing him in the back seat of his patrol car. Barbagallo testified that at this point defendant was not free to leave. (T at 59). I find that this detention of defendant was an unlawful arrest.

■ A police officer may lawfully detain an individual temporarily and for certain

---

**2.** This is not to suggest that Barbagallo possessed probable cause after he touched the ob-

ject. *See* discussion, *infra.*

limited purposes on less than probable cause. *Terry v. Ohio, supra,* 392 U.S. 1, 88 S.Ct. 1868. Although such detentions are "seizures" in the Fourth Amendment sense, they are justified if the police officer has "articulable suspicion that a person has committed or is about to commit a crime." *Florida v. Royer, supra,* 460 U.S. at 498, 103 S.Ct. at 1324. A police officer may make such a limited seizure to question an individual for the purpose of investigating a crime. However, "... an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Id.,* 460 U.S. at 500, 103 S.Ct. at 1325.

■ Even if Barbagallo had reasonable suspicion to justify a temporary seizure, his placing defendant in the back seat of a patrol car is not the type of "... brief and narrowly circumscribed intrusion[ ] ..." justifiable in such circumstances. *Dunaway v. New York,* 442 U.S. 200, 212, 99 S.Ct. 2248, 2256, 60 L.Ed.2d 824 (1979). This was not a permissible investigative seizure, as was the police detention of defendant's suitcase in *United States v. Hooper,* 935 F.2d 484 (2d Cir.1991). In *Hooper,* DEA agents seized and retained possession of defendant's suitcase based on their reasonable suspicion that the suitcase contained contraband, but allowed defendant to go on his way. In contrast, Barbagallo's investigative methods were not "... the least intrusive means reasonably available to verify or dispel [his] suspicion in a short period of time." *Florida v. Royer, supra,* 460 U.S. at 500, 103 S.Ct. at 1325–26. At most, Barbagallo may have had reasonable suspicion to justify detaining the duffel bag (or the pants themselves) until some reasonably prompt method of confirming or dispelling such suspicion could take place.[3]

Therefore, I find that defendant's detention in the patrol car "... was a more serious intrusion on his personal liberty than is allowable on the mere suspicion of criminal activity." *Id.,* 460 U.S. at 502, 103 S.Ct. at 1326–27. As a practical matter,

defendant's detention was an arrest and was therefore unlawful unless supported by probable cause.

An officer has probable cause for arrest when he has " 'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient in themselves to warrant a person of reasonable caution in the belief that (1) an offense has been or is being committed (2) by the person to be arrested.' " *United States v. Ceballos,* 812 F.2d 42, 50 (2d Cir.1987), quoting *United States v. Fisher,* 702 F.2d 372, 375 (2d Cir.1983). In determining whether probable cause existed, a court must consider the "totality-of-the-circumstances." *Ceballos, supra,* 812 F.2d at 50, citing *Illinois v. Gates,* 462 U.S. 213, 230, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527 (1983). I find that Barbagallo did not have probable cause to believe that defendant had committed a crime when he arrested him by detaining him in the patrol car.

At the time of the arrest, Barbagallo had knowledge of the following facts: Defendant, a nervous man who spoke with an accent, had just disembarked from a train that originated in New York City. Barbagallo twice noticed defendant staring at him. He was in a hurry to go somewhere on Rich Street in Buffalo and was willing to share a cab in order to get there faster. Barbagallo did not know where defendant was coming from. Defendant consented to speak with Barbagallo and produced two (perhaps three) pieces of identification at Barbagallo's request. Defendant further consented to let Barbagallo see if he had any other identification in the bag he was carrying. Defendant took a pair of pants out of the bag and Barbagallo saw a piece of brown paper sticking out the pants' pocket. Defendant claimed not to know what it was. Barbagallo reached into the pocket and felt that it contained a firm object, but did not see what it was. Defendant refused to allow Barbagallo to remove the object from the pocket and became excited.

Taken as a whole, these facts do not constitute probable cause. Barbagallo con-

---

**3.** I note that because a *Hooper*-type seizure did not occur in this case, the issue of the propriety

of such a seizure under these facts is not before me and I make no ruling on it.

ceded that defendant's nervousness, the fact that he was in a hurry and that he attempted to double up in a taxicab are not necessarily indicative of criminal activity. (T at 32; 33; 38–39). More importantly, it is evident from Barbagallo's testimony that he detained defendant because he believed that the bag in the pocket contained a controlled substance. (T at 21). This belief was based in part, apparently, on the fact that Barbagallo had "... seen packages like that in the past." (T at 21). However, Barbagallo's testimony establishes that at the time he detained defendant he had not seen what was in the pocket, but had only felt it to be firm. Therefore, to the extent Barbagallo knew from police experience how controlled substances were packaged, such experience was of limited value in reaching a conclusion about an object he had not yet seen. *Compare United States v. Moreno, supra,* 897 F.2d at 28 (suspect opened a white plastic bag to show the agent what was inside; agent "... looked in the bag and observed a brick-shaped package wrapped in brown paper and tape which [the agent] believed, based on his experience, to contain cocaine.").

Thus, while Barbagallo may have suspected that defendant was in possession of a controlled substance, such suspicion was not equivalent to probable cause sufficient to justify his arrest. Therefore, the arrest was unlawful.

*Defendant's Consent to the Search of the Package at the DEA Office*

■ Defendant remained under unlawful arrest as he was transported to the DEA

office.[4] Therefore, I must next determine whether this unlawful arrest tainted defendant's alleged consent to the search of the paper bag given to Judge and Migliore at the office.[5] I find that it did.

A statement made by a defendant during an unlawful detention may be admissible if the statement is "... sufficiently an act of free will to purge the primary taint of the unlawful invasion." *Wong Sun v. United States,* 371 U.S. 471, 486, 83 S.Ct. 407, 416–17, 9 L.Ed.2d 441 (1963). *See also Brown v. Illinois,* 422 U.S. 590, 600, 95 S.Ct. 2254, 2260, 45 L.Ed.2d 416 (1975) (relevant inquiry is whether "... statements were obtained by exploitation of the illegality of the arrest."). Generally, the primary taint remains unpurged in instances where "... the consents to search and the statements given were too closely connected in context and time to the illegal arrest to break the chain of illegality." *United States v. Ceballos, supra,* 812 F.2d at 50, citing *Florida v. Royer, supra,* 460 U.S. at 502–03, 103 S.Ct. at 1326–27. Relevant to whether the chain has been broken are whether *Miranda* warnings were given, the temporal proximity of the detention and the alleged consents, the presence of intervening circumstances, and the purpose and flagrancy of the illegal arrest. *Ceballos, supra,* 812 F.2d at 50, citing *Brown v. Illinois, supra,* 422 U.S. at 603–04, 95 S.Ct. at 2261–62.

In this case, no *Miranda* warnings were afforded defendant before Judge and Migliore asked him for his consent to open the

---

**4.** In this regard, Judge's testimony that defendant was not under arrest when he was first brought to the DEA office is irreconcilable with his further testimony that at the same time defendant was not free to leave, (T at 78), and Barbagallo's earlier testimony that defendant was not free to leave after being placed in the patrol car. (T at 59). That defendant was not formally placed under arrest cannot justify his *de facto* arrest on less than probable cause. *See Dunaway v. New York, supra,* 442 U.S. at 212–13, 99 S.Ct. at 2256–57.

**5.** It is undisputed that the agents did not advise defendant of his *Miranda* rights before he allegedly consented to the search of the paper bag. However, this fact does not automatically ren-

der the consent inadmissible. The Second Circuit has stated, in dictum, that *Miranda* warnings are not a prerequisite to an effective consent to search because such consent "is not 'evidence of a testimonial or communicative nature.'" *United States v. Faruolo,* 506 F.2d 490, 495 (2d Cir.1974), quoting *Schmerber v. California,* 384 U.S. 757, 761, 86 S.Ct. 1826, 1830, 16 L.Ed.2d 908 (1966). *See also United States v. Glenna,* 878 F.2d 967, 971 (7th Cir.1989), and the cases cited therein. Therefore, I am required to assess the circumstances of defendant's consent pursuant to a Fourth Amendment analysis rather than one under the Fifth Amendment.

package at the DEA office.[6] It appears from the testimony given at the hearing that defendant gave his consent to the search no more than thirty minutes after Barbagallo had placed him in the car, and no more than forty-five minutes after his initial encounter with Barbagallo. *See Brown v. Illinois, supra,* 422 U.S. at 604, 95 S.Ct. at 2262 (ruling inadmissible defendant's statement, which followed his illegal arrest by less than two hours). No significant intervening events occurred; defendant was transported from the train station to the DEA office, placed in a room and his consent was requested. Further, the purpose of the illegal arrest apparently was to obtain defendant's consent to open the package or to otherwise gain access to it. This is illustrated by the fact that defendant was informed that he was under arrest and advised of his *Miranda* rights only *after* the package was opened, and the government has not claimed that it possessed probable cause before that time. *See Dunaway v. New York, supra,* 442 U.S. at 218, 99 S.Ct. at 2260 (subject "seized without probable cause in the hope that something might turn up ..."). Finally, defendant initially refused to give his consent, and acquiesced only after Judge and Migliore threatened to obtain a search warrant and suggested that they would obtain a drug dog.[7]

Accordingly, I find that defendant's consent to the search of the package was tainted by the unlawful arrest. *See generally, Florida v. Royer, supra,* 460 U.S. at 507–08, 103 S.Ct. at 1329 (consent to search luggage tainted by unlawful arrest); *United States v. Watson,* 423 U.S. 411, 424, 96 S.Ct. 820, 828, 46 L.Ed.2d 598 (1976) (dicta) (implying that "the confines of a police station" could be "a subtle form of coercion that might flaw [defendant's] judgment.") The fruits of that search must therefore be suppressed.

### Defendant's Oral Statements

Likewise, under this same analysis, I find that defendant's incriminating oral statements made after the search were tainted by the unlawful arrest and must also be suppressed.[8] Three things occurred between the time defendant was first unlawfully arrested and the time he made the oral statements. First, defendant allegedly consented to the search. Second, the search was conducted. Third, both Judge and Migliore orally advised defendant of his *Miranda* rights. I have already found that defendant's consent was invalid and the search was unlawful. Other than this invalid consent and unlawful search, the only significant intervening event was the administration of *Miranda* warnings. "*Miranda* warnings, *alone* and *per se,* cannot always make the act sufficiently a product of free will to break, for Fourth Amendment purposes, the causal connection between the illegality and the confession." *Brown v. Illinois, supra,* 422 U.S. at 603, 95 S.Ct. at 2261 (emphasis in original). Further, it appears from the testimony that defendant made the oral state-

---

**6.** This is not surprising, given the fact that the government insists that defendant was not under arrest until after the agents discovered the alleged controlled substance in the package.

**7.** I am cognizant of those cases holding that a police officer's statement to a subject that a search warrant could be obtained if the subject refuses consent to a search does not vitiate an otherwise voluntary consent. *See e.g., United States v. Faruolo, supra,* 506 F.2d at 495. However, in *United States v. Vazquez,* 638 F.2d 507, 529 (2d Cir.1980), *cert. denied,* 454 U.S. 975, 102 S.Ct. 528, 70 L.Ed.2d 396 (1981), the court suggested that this rule is by no means iron-clad if the police officers are under an honest but mistaken belief that a search warrant would issue. Given the absence of probable cause in the instant case, it is possible that the police here were under such an honest but mistaken belief. Therefore, although not determinative, I believe that Judge's statement to defendant that they intended to apply for a search warrant is a relevant factor which I have considered in determining whether defendant's consent was tainted by the illegal arrest.

**8.** Judge testified that defendant "... told us basically that he was from New York City, and that he was paid a certain amount of money, which I don't recall right now, to deliver the package to an individual in Buffalo." (T at 81). While such statements, made after defendant had been advised of his rights, may have been "voluntary" for purposes of the Fifth Amendment, they must still pass muster under the Fourth Amendment. *Dunaway v. New York, supra,* 442 U.S. at 216–17, 99 S.Ct. at 2259.

ments no more than ten minutes after the search of the package was conducted. I cannot say that advising defendant of his *Miranda* rights in the short period between the time of the unlawful search and the time defendant made the incriminating oral statements sufficiently attenuated such statements from the taint of the unlawful arrest.

Accordingly, defendant's oral statements must likewise be suppressed.

*Defendant's Written Statement*

■ Finally, I must determine whether defendant's unlawful arrest tainted the written statement he gave to Judge and Migliore. I find that this statement was freely and voluntarily made by defendant and was "sufficiently attenuated" from the unlawful arrest to permit the use of the statement at trial. *Dunaway v. New York, supra,* 442 U.S. at 216, 99 S.Ct. at 2258.

First, defendant was advised of his *Miranda* rights prior to giving the statement.[9] Although, as previously noted, *Miranda* warnings alone will not attenuate the taint of an unlawful arrest, the fact that they were given is "... an important factor ... in determining whether the confession is obtained by exploitation of an illegal arrest." *Brown v. Illinois, supra,* 422 U.S. at 603, 95 S.Ct. at 2261.

Second, nearly three hours had passed between the beginning of the unlawful arrest and the time the defendant made and signed the statement. Further, the nature of a written statement, as opposed to an oral one, allows defendant to reflect upon the statement he wishes to make and to review it before signing it, making it more likely that the statement is a product of free will and not police coercion.

More importantly, significant intervening events had occurred between the time defendant was arrested and the time he made the statement. Defendant had agreed to cooperate with the government, and he had made two telephone calls to an individual believed to be Ricky Santana in an attempt to arrange a controlled delivery of the alleged cocaine.

Therefore, I find that defendant's written statement was sufficiently attenuated from the unlawful arrest. Accordingly, defendant's written statement will not be suppressed and the government may use it at trial.

## CONCLUSION

For the reasons articulated above, I find that defendant was unlawfully arrested and that his consent to the search of the package containing alleged cocaine was tainted thereby. Therefore, the fruits of the search must be suppressed.

Further, I find that defendant's incriminating oral statements were also tainted by the unlawful arrest and must be suppressed.

Finally, I find that defendant's written statement was not obtained through exploitation of the unlawful arrest and need not be suppressed.

## ORDER

IT HEREBY IS ORDERED, that defendant's motion to suppress is GRANTED in part and DENIED in part, as more fully set forth in the above Decision.

IT FURTHER IS ORDERED, that the parties shall meet with the Court for a status conference on October 3, 1991 at 1:45 p.m. in Part IV, Mahoney State Office Building, 65 Court Street, Buffalo, New York.

SO ORDERED.

## EXHIBIT A

Statement of Johnny Delgado given to Task Force Officers, Judge and Migliore at the Buffalo RO on 5–6–91 at approximately 7:00 p.m.

---

9. I note that, contrary to Judge's testimony at the hearing (T at 75), defendant's written statement does not contain an advisement of rights. However, defendant had been earlier advised of his rights orally by both Migliore and Judge. (T at 74). Therefore, for purposes of my analysis of whether the written statement was tainted by the unlawful arrest, I find that defendant did receive *Miranda* warnings.

1. On or about 4/20/91, I was introduced to a Dominican Male named Rickey Santana. Santana was introduced to me by a person I know only as Jose. We were introduced to each other in the vicinity of 105th and Columbus Ave., Manhattan, NY.

2. At this time Ricky Santana ask me if I wanted to make some money. I told him yes. Santana then told me I would have to deliver a package to downtown Buffalo. Santana then told me, he would get back to me in a couple of weeks.

3. On 5–5–91, I again met with Ricky Santana at a Restaurant near 105th and Columbus Avenue. At this time Rickey Santana told me he would pay me $600.00 if I would deliver a package to Buffalo via train. Ricky Santana told me to meet at this same location at approximately 8:00 p.m. where he would give me the package.

4. At approximately 8:00 pm on 5–5–91 I again met with Ricky Santana at the same Restaurant where Santana handed me a small package wrapped I brown in brown paper that I assumed was cocaine. Santana also handed me a 1–way train ticket to Buffalo. Santana also provided me with a telephone number (863–4679) to call when I arrived in Buffalo.

5. Upon arrival in Buffalo, I was approached by a member of the U.S. Border Patrol. The Border Patrol Agent asked me my name and permission to search my Gym Bag. At which time I told him my name and gave permission to look in my bag.

6. The Border Patrol Agent asked me what was in the paper bag and I refused to answer. The Border Patrol Agent told me he was going to call DEA.

7. I was then brought to the DEA Office where I gave permission to look inside the bag.

8. After looking in the bag Pat Judge told me I was under arrest for possession of cocaine at which time he read me my rights.

9. I then advised Pat Judge that I would attempt to call Ricky Santana on the phone and have him meet me. After several attempts and conversations with Ricky Santana he never showed up to meet me.

I have read this statement consisting of 3 pages and believe it to be true and correct to the best of my ability. I give this statement of my own free will with out threats or promises.

Johnny Delgado 5/6/91

Patrick Judge 5/6/91

Joseph E. Migliore 5/6/91