**UNITED STATES of America**

v.

**Felipe DURAN, Defendant.**

**No. 93–CR–104S.**

United States District Court,
W.D. New York.

March 4, 1994.

Patrick H. Nemoyer, U.S. Atty., Buffalo, NY, for the Government (Leibert F. Coppola, Asst. U.S. Atty., of counsel).

Michael A. Battle, Asst. Public Defender, Buffalo, NY, for defendant.

## DECISION AND ORDER

SKRETNY, District Judge.

### INTRODUCTION

Presently before this Court are the objections of defendant Felipe Duran to the Report and Recommendation ("R & R") of Hon. Carol E. Heckman, United States Magistrate Judge for the Western District of New York, filed on November 8, 1993, denying defendant's motion to suppress narcotics seized from him on March 21, 1993 after his arrival on a Greyhound bus from New York City. For the reasons discussed below, this Court will accept the Report and Recommendation of Magistrate Judge Heckman, and will deny defendant's suppression motion.

### FACTS

The parties do not object to the recitation of the facts contained in the Report and Recommendation. Therefore, the facts will not be repeated here. On November 8, 1993 Magistrate Judge Heckman filed a Report and Recommendation, recommending that defendant's present motion be denied. On November 18, 1993 defendant filed Objections to Magistrate Judge's Report and Recommendation ("Objections"). Defendant objects to the Report and Recommendation in four respects. First, defendant objects to the Magistrate Judge's finding that "[DEA] Agent Johnson had reasonable suspicion to believe that the defendant may be unlawfully in the United States." (R & R, p. 11). Defendant argues that the factors cited by the Magistrate Judge were insufficient to give rise to reasonable suspicion. Second, defendant argues that, even if Agent Johnson had reasonable suspicion to suspect that defendant was in violation of immigration laws, the subsequent joint DEA and Border Patrol investigation was not sufficiently limited in scope to justify the continued detention of defendant and the search of his sneakers. Third, defendant objects to the Magistrate Judge's finding that defendant voluntarily consented to the search of his sneakers. Finally, defendant argues that the Magistrate Judge failed to address his argument that the scope of the sneaker search exceeded the scope of any consent that was obtained from him.

On December 16, 1993 the government filed an Affidavit of Leibert F. Coppola ("Coppola Affid.") in opposition to defendant's Objections. Although invited to do so by an Order of this Court entered on December 6, 1993, defendant failed to submit a reply.

Upon receiving defendant's Objections, this Court recognized that it had not yet entered an Order referring to Magistrate Judge Heckman motions for hearing and preparation of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B). Whereas neither party has raised this issue in motion papers and no objection has been expressed, this Court will make the appropriate referral below, *nunc pro tunc*.

### DISCUSSION

#### Reasonable Suspicion Supporting Initial Investigatory Stop

■ Magistrate Judge Heckman determined that Agent Johnson objectively had sufficient reasonable suspicion to support his request that defendant accompany him and Deputy Frye into the NFTA security office for further questioning. (R & R, p. 10). Magistrate Judge Heckman wrote:

Agent Johnson had reasonable suspicion to believe that the defendant may be unlawfully in the United States. The defendant spoke broken English with a Hispanic accent, gave somewhat vague and inconsistent information about where he was going, and claimed to be born in New York but produced a Dominican Republic identification card. Agent Johnson was therefore entitled to detain Duran for a brief period of time to determine his identity

and alienage. *Florida v. Royer, supra,* 460 U.S. [491] at 500 [103 S.Ct. 1319, at 1325–26, 75 L.Ed.2d 229 (1983)].

(R & R, p. 11). Defendant objects to this determination, arguing that the facts indicated by Magistrate Judge Heckman "simply do not provide reason to believe that the defendant was unlawfully in the United States." (Objections, ¶ 2). Defendant relies on the fact that Agent Johnson did not ask defendant for his "green card", (*Ibid.*), and cites a number of cases, including this Court's decision in *United States v. Reyes,* 1992 WL 170885 (W.D.N.Y.1992), *aff'd,* 999 F.2d 536 (2d Cir.1993), for the proposition that a finding of reasonable suspicion may be premised, in part, upon a criminal suspect's failure to produce proper immigration documents. *See also Ojeda–Vinales v. INS,* 523 F.2d 286 (2d Cir.1975); *United States v. Hernandez–Rojas,* 470 F.Supp. 1212, *aff'd,* 615 F.2d 1351 (2d Cir.1979).

This Court believes that Magistrate Judge Heckman correctly determined that the facts and circumstances presented to Agent Johnson provided reasonable suspicion for the investigatory stop. Defendant cites absolutely no authority indicating that an officer's decision whether to ask to see a suspect's green card is a *sine qua non* of a finding of reasonable suspicion. As the government notes in its responsive affidavit, the standard for reasonable suspicion is objective, not subjective. (Coppola Affid. ¶ 3). *See Terry v. Ohio,* 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The question is whether the officer can "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion (footnote omitted)." *Id.* at 21, 88 S.Ct. at 1880. Here, the facts and circumstances of Johnson's encounter with defendant warranted the limited intrusion. Johnson noticed defendant alighting from the overnight express bus from New York City (T1, p. 7)[1] and acting suspiciously in the bus terminal. (T1, pp. 10, 24). Defendant spoke broken English, and told the officers that he had come from New York City, where he travelled to pick up clothes. (T1, p. 12). Johnson then asked defendant where he

lived. Defendant responded, "New York City" and then quickly changed his answer to "Buffalo" (T1, pp. 13, 18). Although defendant told Johnson that defendant lived on the west side of Buffalo, defendant handed Johnson a piece of paper indicating defendant's address. Johnson knew that the street listed was actually on the east side of Buffalo. Although defendant indicated that he was born in New York, which would have made him a United States citizen, defendant showed Johnson an identification card issued by the Consulate for the Dominican Republic.

These facts and circumstances supported a reasonable suspicion that defendant was in the United States illegally. Therefore, Agent Johnson properly detained defendant for a short time to determine his identity and alienage. Here, as in the cases cited by defendant, reasonable suspicion fails to hinge upon whether the officer asked the suspect to produce a green card. The additional factors, when considered together, *see United States v. Hall,* 525 F.2d 857, 859 (D.C.Cir. 1976), justified the investigatory stop.

### Scope of the Detention

■ Magistrate Judge Heckman found that the officers did not exceed the permissible scope of the investigatory stop by verifying defendant's address before releasing him, even though defendant had by that time satisfied the officers that he was legally entitled to remain in the United States.

Defendant objects to this conclusion, arguing that once the officers determined that defendant was legally permitted to remain in the United States, they were obligated immediately to release him, and to ask no further questions.

This Court finds that the officers did not exceed the scope of a permissible investigatory stop by their limited questioning. Indeed, the "scope of the detention must be carefully tailored to its underlying justification." *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983). However, considering the very short time period involved, and the reasonableness of the inquiry about defendant's address, this Court believes that the "nature and quality of the

1. References are to the transcripts of the suppression hearing.

intrusion" were not unreasonable, and did not effect a violation of defendant's Fourth Amendment rights. *Terry*, 392 U.S. at 24, 88 S.Ct. at 1881. Although Agent Norton recognized defendant at the NFTA terminal, defendant was nonetheless known to the officers as an illegal alien, and defendant provided questionable information about his Buffalo address. The officers' brief inquiry into defendant's true address did not extend beyond the purposes for which the stop was made, and no Fourth Amendment violation occurred.

### Consent to the Search of Sneakers

Magistrate Judge Heckman concluded that defendant voluntarily consented to the search of his sneakers while in the NFTA terminal, writing:

> ... I refuse to find that the defendant's will was overcome, rendering his verbal consent to search involuntary. The search of the sneaker took place in the course of a limited and legal detention. The defendant was not handcuffed, the questioning had not been prolonged, and the defendant had not been physically touched or abused in any way. The record shows that when Agent Barbegallo requested permission to examine defendant's sneaker, the defendant willingly removed first his right sneaker and then his left.

> Viewing the totality of circumstances, I find that the defendant consented to the search of his left sneaker.

(R & R, p. 13). Defendant argues that this conclusion is inconsistent with what he believes to be a factual finding of Magistrate Judge Heckman contained at page 4 of her Report and Recommendation. The passage at issue states, "Defendant's behavior indicates submission to authority rather than voluntary consent." However, this sentence is part of a paragraph in which Magistrate Judge Heckman is outlining the arguments of defense counsel. The sentence is not, as defendant believes, a factual finding. It is a summary of counsels' arguments, which is immediately followed by a discussion of the applicable standards of law and the ultimate conclusion on page 13 of the Report and Recommendation. This Court agrees with that conclusion, and defendant raises no ad-

ditional arguments in opposition to it. Therefore, this Court will adopt the Magistrate Judge's finding that the search of defendant's sneakers was effected with the voluntary consent of defendant.

### Scope of the Search of Sneakers

■ Finally, defendant argues that the Magistrate Judge failed to find that the scope of the sneaker search exceeded the scope of the consent that was provided by defendant. This argument is unsupported in the record. The transcript of the suppression hearing shows that Agent Barbegallo asked defendant, in Spanish, for permission to examine defendant's sneakers. Defendant removed his right sneaker, handed it to Barbegallo, and proceeded to remove his left sneaker as well. (T2, p. 11). This behavior is reasonably interpreted to indicate that defendant consented to a search of both sneakers. Barbegallo noticed something inside the left sneaker, and handed the sneaker to Agent Johnson. Johnson searched the left sneaker and removed blue tissue paper from the insole. Below the tissue paper, Johnson found cocaine base. Johnson tested the substance for the presence of cocaine, and then placed defendant under arrest. Agent Barbegallo read defendant his *Miranda* rights. (T2, p. 30).

On the basis of these facts, this Court believes that the scope of the sneaker search did not exceed the scope of the consent provided by defendant. Defendant's act of removing both sneakers indicates his consent, and the actions the officers took in connection with the search were not unreasonable. Therefore, this Court finds that defendant's Fourth Amendment rights were not violated by the sneaker search.

### CONCLUSION

After carefully reviewing the Report and Recommendation of Magistrate Judge Heckman, as well as the objections and other materials submitted by the parties, and after considering *de novo* the matters raised by defendant, this Court will accept the Report and Recommendation, including the authorities cited and the reasons provided therein.

Therefore, this Court will deny defendant's suppression motion in all respects.

## ORDER

IT HEREBY IS ORDERED that, *nunc pro tunc* as of April 20, 1993, all pretrial matters in this case are referred to the Hon. Carol E. Heckman, United States Magistrate Judge for the Western District of New York, including all pretrial matters that a Magistrate Judge may hear and determine pursuant to 28 U.S.C. § 636(b)(1)(A), and those which a Magistrate Judge may hear and thereafter file a report and recommendation for disposition pursuant to § 636(b)(1)(B).

FURTHER, that this Court ACCEPTS the Report and Recommendation of Magistrate Judge Heckman filed on November 8, 1993, including the authorities cited and the reasons provided therein.

FURTHER, that defendant's motion to suppress evidence is DENIED.

SO ORDERED.

## REPORT AND RECOMMENDATION

HECKMAN, United States Magistrate Judge.

The defendant has been indicted on two counts of violating the federal drug laws. The first count charges the defendant with possession with intent to distribute five grams or more of a mixture containing cocaine base in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B). The second count charges the defendant with knowingly, intentionally and unlawfully possessing in excess of five grams of a mixture containing cocaine base, in violation of 21 U.S.C. § 844(a).

Defendant moves for suppression of narcotics seized from him on March 21, 1993 after his arrival on a Greyhound bus from New York City. A suppression hearing was held on June 10 and June 16, 1993. The

parties were then given an opportunity to brief the issues, and oral argument was scheduled for August 18, 1993 at 2:00 p.m. At oral argument, the court requested the parties to submit additional briefs on the impact of Judge Skretny's decision in *United States v. Reyes*, No. CR–91–56S, 1992 WL 170885 (W.D.N.Y. June 24, 1992), *aff'd,* 999 F.2d 536 (2d Cir. June 11, 1993), on this case. Accordingly, additional filings were received and further argument was heard on September 8, 1993. At that time, the motion was submitted for decision.

For the reasons set forth below, it is recommended that defendant's motion be denied.

## BACKGROUND

At the suppression hearing, the government called three witnesses: DEA Agent Bruce R. Johnson and Border Patrol Agents Patrick Norton and Gregory Barbegallo. No witnesses or evidence were presented by the defendant.

Agent Johnson testified that he is a member of DEA's transportation unit and that he was on duty at the NFTA downtown bus terminal shortly before 9:00 a.m. on March 21, 1993. Working with him that day were Investigator Paul Terranova of the Erie County Sheriff's Department, who is assigned to the DEA Task Force, and Niagara County Sheriff Deputy Randy Frye, also assigned to the Task Force (T1 at 6–7).[1] Agent Johnson was outside at the bus arrival portion of the terminal and Investigator Terranova and Deputy Frye were inside the terminal when the Greyhound overnight express bus from New York City arrived. The bus arrived at approximately 8:45 a.m. Through past investigations, the law enforcement officers were aware that overnight express buses from New York City were a common method for drug traffickers to bring narcotics into Buffalo (T1 at 7).

Agent Johnson noticed that the first passenger who got off the bus, later identified as the defendant, walked rapidly from the bus, entered the terminal through an entrance 40

---

1. References are to pages of the suppression hearing transcript: T1 is from proceeding on

June 10, 1993 and T2 is from proceedings on June 16, 1993.

feet from the entrance directly in front of the bus, walked quickly through the terminal, and kept turning around and looking back toward the bus (T1 at 10, 24).

Agent Johnson, followed closely by Deputy Frye, approached the defendant as he exited the terminal. Duran was approaching a taxicab stand on North Division Street. Johnson and Frye displayed their badges to Duran and told him that they wished to speak to him. According to the government witnesses, the defendant consented. Agent Johnson then asked the defendant if he spoke English, and the defendant replied, "a little." Agent Johnson then asked the defendant where he was coming from. The defendant, speaking in broken English with a Hispanic accent, advised Johnson that he was coming from New York and that he had been there to pick up clothes (T1 at 12).

Agent Johnson next asked Duran where he lived and the defendant replied New York, then quickly changed his answer to Buffalo (T1 at 13, 38). Agent Johnson asked him where he lived in Buffalo and the defendant answered, "the west side." Agent Johnson asked him where on the west side, and the defendant pulled from his jacket a scrap of paper that purportedly contained an address on Roetzer Street, which was known by Agent Johnson to be a street on Buffalo's east side.

Agent Johnson then asked the defendant where he was born, and the defendant replied, "New York." Because of defendant's accent, Agent Johnson asked him for identification and the defendant took from his wallet a plastic laminated identification card. Agent Johnson returned the card but noted that the card had been issued by the Consulate for the Dominican Republic. Agent Johnson testified that he believed that the defendant had been born in the Dominican Republic, rather than in New York City as the defendant claimed, and Johnson therefore asked Duran to come with him into the NFTA police office inside the terminal in order to contact the U.S. Border Patrol and verify his immigration status. According to Johnson, the defendant consented, and followed Agent Johnson and Frye into the terminal (T1 at 14).

Once inside, Agent Johnson contacted the U.S. Border Patrol office and talked to Agent Barbegallo, who agreed to come down to the terminal. Approximately 15 minutes later, Agents Barbegallo and Norton arrived. Agent Norton immediately recognized the defendant from previous encounters as an illegal alien who had been allowed to remain in the United States pending the outcome of a class action lawsuit brought by Catholic Relief Services regarding the alien status of certain individuals (T1 at 15–17, 77, 82).

Agent Norton and the defendant then conversed in Spanish and the defendant explained that he had come to Buffalo to live with a friend and had been in New York City to pick up clothes (T1 at 83, 101). Agent Norton asked him for a telephone number and address to verify his residence. According to Agent Norton, Duran at that point asked Norton if he wanted to see the clothes he had picked up in New York and voluntarily dumped the contents of his bag on the desk in the office (T1 at 84–85). Agent Barbegallo's testimony was different on this point. According to Agent Barbegallo, Agent Johnson, in English, asked Agent Norton to request, in Spanish, permission to search the defendant and his belongings (T2 at 9). The defendant consented.

Agent Norton asked Agent Barbegallo to move from behind the desk where he was seated so Norton could use the phone (T2 at 9–10). While Norton called the telephone number the defendant had given him, the defendant consented to a pat down search, which was negative (T1 at 51–52; T2 at 9). When he changed places with Norton, Barbegallo noticed that the defendant's left foot appeared higher out of his sneaker than the right foot (T2 at 10). Agent Barbegallo asked Agent Johnson if the defendant's sneakers had been examined and Agent Johnson replied that they had not. Agent Barbegallo then asked the defendant, in Spanish, for permission to examine his sneakers and the defendant removed his right sneaker and handed it to Agent Barbegallo (T2 at 11). Duran then removed his left sneaker as well. Barbegallo noticed something in the left sneaker and handed it to Agent Johnson. Johnson then searched

Duran's left sneaker, removing blue tissue paper from the insole. Underneath the blue tissue paper, Johnson found a quantity of cocaine base. After testing the substance for the presence of cocaine, Johnson placed the defendant under arrest and Agent Barbegallo read the defendant his *Miranda* rights (T2 at 30).

### DISCUSSION

Defendant argues that he ·was illegally seized on the street outside the bus station and that the cocaine was the tainted fruit of an illegal seizure. Defendant also argues that he did not voluntarily consent to a search of his person and his belongings or to a search of his sneaker. Each of these contentions is discussed below.

I find that the initial encounter between the defendant and Agent Johnson was consensual. It is well established that not every encounter between a police officer and a citizen is a seizure implicating the Fourth Amendment. *Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968). "Certainly, a police officer is free to approach a person in public and ask a few questions; such conduct, without more, does not constitute a seizure." *U.S. v. Lee*, 916 F.2d 814, 819 (2d Cir.1990) (citing *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 1323–24, 75 L.Ed.2d 229 (1983)). As the Supreme Court recently stated in *Florida v. Bostick*, 501 U.S. 429, ——, 111 S.Ct. 2382, 2389, 115 L.Ed.2d 389 (1991):

> We adhere to the rule that, in order to determine whether a particular encounter constitutes a seizure, the court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter.

Thus, the inquiry in determining whether a seizure has occurred must focus on whether the police conduct was impermissibly coercive. *United States v. Thompson*, 941 F.2d 66, 69 (2d Cir.1991) (citing *Florida v. Bostick*, *supra*). To constitute a seizure, the restraint of an individual "... must result in a restriction of the individual's autonomy; in

general, the cases turn on the degree of voluntariness that an individual maintains in an encounter with police." *United States v. Madison*, 936 F.2d 90, 93 (2d Cir.1991). Examples of circumstances which indicate that the seizure has occurred include: "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980). For a mere encounter to be considered a seizure, substantial showing of force or authority is required. *United States v. Barrios–Moriera*, 872 F.2d 12, 15 (2d Cir.), *cert. denied*, 493 U.S. 953, 110 S.Ct. 364, 107 L.Ed.2d 350 (1989).

In this case, the initial encounter with the defendant was not so coercive as to communicate to the defendant that he was not free to decline the request for information or to terminate the encounter. Nor was it so invasive or onerous as to require a showing of reasonable suspicion or probable cause. *See*, *United States v. Glover*, 957 F.2d 1004, 1009 (2d Cir.1992); *United States v. Hooper*, 935 F.2d 484, 490–91 (2d Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 663, 116 L.Ed.2d 754 (1991). Duran had been walking rapidly through the bus terminal, frequently looking over his shoulder. Johnson approached him, in plain clothes but displaying a badge, and asked him a series of questions designed to determine his destination. Because the defendant spoke only broken English with a Hispanic accent, Johnson inquired into his place of birth and requested identification. Such questioning does not constitute a Fourth Amendment seizure. *I.N.S. v. Delgado*, 466 U.S. 210, 219–220, 104 S.Ct. 1758, 1764–1765, 80 L.Ed.2d 247 (1984).

■ Citing *United States v. Jordan*, 958 F.2d 1085, 1087 (D.C.Cir.1992), defendant argues that he was seized because Johnson asked for and retained an immigration document belonging to the defendant which identified defendant as a plaintiff in an immigration lawsuit. Although the *Jordan* case does in fact stand for the principle cited by defen-

dant, there is no factual basis in the record supporting defendant's view of the facts.

According to the uncontradicted testimony of Johnson, he returned defendant's identification to him immediately after he examined it on the street (T1 at 66). After the arrest, the agents took another piece of paper from the defendant, marked as Ex.D at the suppression hearing, which identified the defendant as a plaintiff in an immigration lawsuit (T1 at 64–65).

Agent Norton testified that he heard of this piece of paper in the patrol car on the way to the bus terminal (T1 at 91–92). This was, of course, prior to defendant's arrest and appears to be inconsistent with Johnson's testimony. Agent Norton went on to testify that he did not recall seeing Ex.D when he arrived at the NFTA office. He immediately recognized the defendant and knew that he had already seen the document at the Sheriff's Department headquarters the previous December when he had apparently questioned the defendant (T1 at 93).

Based on Norton's testimony, defendant surmises that Ex.D must have been given to Agent Johnson on the street and retained by him when he brought Duran into the NFTA police station. Agent Barbegallo testified that Agent Johnson did *not* advise him of defendant's involvement with the Catholic Services lawsuit in their initial telephone call or in the patrol car, but he learned about the lawsuit at the bus station when Agent Norton showed him Ex.D (T–2 at 17–18). He testified that he saw Ex.D "within the first few minutes" of his arrival and before defendant removed his sneaker (T2 at 18). This again was before the arrest but obviously after the defendant was taken into the station.

In summary, the record is somewhat unclear as to when Ex.D was first produced, and the testimony is admittedly conflicting. However, there is no testimony which supports defendant's premise that Ex.D was taken by Johnson on the street and retained by him, other than Agent Norton's somewhat equivocal testimony that he learned about defendant's status in the patrol car on the way to the bus station. Based on the testimony at the hearing and judging the credibility of the witnesses, I find that the most likely course of events is that Ex.D was given to Agent Norton by the defendant at the bus station during Norton's questioning about his status and his address.

Other than this argument regarding Ex.D, defendant does not offer any other evidence which would support a finding that the initial encounter was not consensual, and I decline to so find.

However, the consensual nature of the encounter changed once Johnson asked the defendant to go with him and Deputy Frye into the NFTA security office for further questioning. *United States v. Glover, supra,* 957 F.2d at 1015. At that point, Agent Johnson had reasonable suspicion to believe that the defendant may be unlawfully in the United States. The defendant spoke broken English with a Hispanic accent, gave somewhat vague and inconsistent information about where he was going, and claimed to be born in New York but produced a Dominican Republic identification card. Agent Johnson was therefore entitled to detain Duran for a brief period of time to determine his identity and alienage. *Florida v. Royer, supra,* 460 U.S. at 500, 103 S.Ct. at 1325–26.

This leads the analysis to the search of defendant's sneaker. The government theory is that the defendant consented to the search.

Defendant argues, however, that at the time the search had occurred, the INS agents had satisfied themselves that the defendant would be released, and that there was no further justification for holding him. Although the defendant "consented" to the search, counsel argues that the consent was not voluntary. The defendant was not told that he was free to leave or that he need not consent to the search. The defendant was not advised of his *Miranda* rights. The record contains no information as to his intelligence or educational level. It was a small office, being occupied by the defendant and at least four police officers: Agents Johnson, Norton and Barbegallo and Deputy Frye. Defendant's behavior indicates submission to authority rather than voluntary consent.

It is well established that consent to search is determined based on the totality of circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2047–48, 36 L.Ed.2d 854 (1973). "[B]oth the characteristics of the accused and the details of the interrogation" must be considered. *Id.* at 226, 93 S.Ct. at 2047. The government points out that the questioning was not threatening or abusive, nor was it prolonged.

Having already determined as a factual matter that the defendant was not free to leave at the point at which he was "asked" to go into the NFTA terminal, I reject the government's contention that the defendant consented to be questioned and detained by the agents. But the government had a legitimate basis for detaining the defendant: to determine his identity and his immigration status. Contrary to defendant's argument, this basis for the detention continued even during the search of the sneaker. Agent Norton clearly testified that he was on the telephone verifying defendant's address during the time the search of the sneaker took place (T1 at 86–87). It is true that Agent Norton already knew about the Catholic Services lawsuit. This meant that the defendant, although not a legal alien, was permitted to remain in the United States pending the outcome of that lawsuit.[2] However, Agent Norton was still entitled to verify defendant's address prior to releasing him. This was part of Norton's duties as a Border Patrol agent, and constitutes a legitimate reason for brief continued detention.

Accordingly, I specifically reject the defendant's argument that the detention was illegal at the time that the search took place. It is therefore unnecessary to address defendant's contention that the search was the "tainted fruit" of defendant's illegal seizure.

As to the voluntariness of defendant's consent to the search of his sneaker, I refuse to find that the defendant's will was overcome, rendering his verbal consent to search involuntary. The search of the sneaker took place in the course of a limited and legal detention. The defendant was not handcuffed, the questioning had not been prolonged, and the defendant had not been physically touched or abused in any way. The record shows that when Agent Barbegallo requested permission to examine defendant's sneaker, the defendant willingly removed first his right sneaker and then his left.

Viewing the totality of circumstances, I find that the defendant consented to the search of his left sneaker.

### CONCLUSION

For the reasons set forth above, defendant's motion should be denied.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED,** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute, Fed.R.Civ.P. 72(b) and Local Rule 30(a)(3).

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See, e.g., Patterson–Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.,* 840 F.2d 985 (1st Cir.1988).

*Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order. Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Wesolek, et al. v. Canadair Ltd., et al.,* 838 F.2d 55 (2d Cir.1988).

The parties are reminded that, pursuant to Rule 30(a)(3) of the Local Rules for the Western District of New York, "written ob-

---

**2.** I reject the government's argument in its supplemental memorandum that they had probable cause to arrest the defendant because he failed to produce a greed card. The defendant was never asked for a green card. Moreover, at the time the search occurred, the defendant had satisfied the Border Patrol agents that he was entitled to remain in the United States.

jections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." *Failure to comply with the provisions of Rule 30(a)(3), or with the similar provisions of Rule 30(a)(2) (concerning objections to a Magistrate Judge's Decision and Order), may result in the District Court's refusal to consider the objection.*

SO ORDERED.

November 8, 1993.