UNITED STATES of America,

v.

Jose ARCHEVAL–VEGA, Defendant.

No. 92–CR–241A.

United States District Court,
W.D. New York.

Dec. 6, 1994.

Patrick H. NeMoyer, U.S. Atty. (William J. Knapp, Asst. U.S. Atty., of counsel), Buffalo, NY, for the Government.

Johnson & Haynes (Jonathan Johnson, of counsel), Buffalo, NY, for defendant Archeval–Vega.

## DECISION AND ORDER

ARCARA, District Judge.

This matter was referred to the Honorable Leslie G. Foschio, United States Magistrate Judge, pursuant to 28 U.S.C. § 636(b)(1), on October 19, 1992. In an omnibus motion filed November 16, 1992, defendant Archeval–Vega moved for, *inter alia:* (1) suppression of statements and tangible evidence; (2) discovery of any and all statistical informa-tion regarding the racial and ethnic identity of individuals stopped and/or arrested for narcotics related activities at Buffalo area transportation centers, statistical information regarding the racial and ethnic identity of individuals prosecuted for narcotics related offenses at the transportation centers, manu-als, handbooks and other documents contain-ing policies and practices of federal law en-forcement personnel regarding traveler pro-files and engaging travelers for consensual stops and searches, and documents and di-rectives regarding Operation Conductor" and other similar drug interdiction efforts; and (3) a factfinding hearing to demonstrate a prima facie case that race was a determining factor in the decision to stop and engage the defendant at the time of his arrest. The government filed its response to the motion on November 30, 1992, acknowledging the necessity of an evidentiary hearing, but op-posing the defendant's request for discovery and a factfinding hearing on the issue of race as a determining factor in the stop and ques-tioning of travelers at transportation centers.

Magistrate Judge Foschio conducted a suppression hearing on December 8, 1992 and January 15, 1993. On January 10, 1994, the government moved for disqualification of defendant Archeval–Vega's attorney, the Federal Public Defender's Office. On Feb-ruary 1, 1994, Kimberly A. Schechter, Esq., attorney for co-defendant Jocelyn Ramirez, filed an affirmation joining in the govern-ment's motion. On February 17, 1994, Fed-eral Public Defender Jonathan W. Feldman filed an affirmation in response to the gov-ernment's motion for disqualification. By or-der dated July 8, 1994, Magistrate Judge Foschio granted the government's motion to disqualify the Federal Public Defender. Magistrate Judge Foschio subsequently, on August 1, 1994, assigned Jonathan Johnsen, Esq. to represent defendant Archeval–Vega.

In a Report and Recommendation dated August 31, 1994, Magistrate Judge Foschio recommended that defendant Archeval–Vega's motion to suppress be denied. In a Report and Recommendation dated Septem-ber 2, 1994, Magistrate Judge Foschio rec-ommended that defendant Archeval–Vega's motion for discovery and a factfinding hear-

ing on the issue of race as a determining factor in the stop and questioning of travelers at transportation centers be denied.

On September 21, 1994, defendant Archeval–Vega filed objections to Magistrate Judge Foschio's Reports and Recommendations of August 31, 1994 and September 2, 1994. Defendant Archeval–Vega also appealed the Magistrate Judge's July 8, 1994 disqualification order. On October 31, 1994, the government submitted its response to defendant Archeval–Vega's objections to the Reports and Recommendations and the appeal of the disqualification order. On November 10, 1994, defendant Archeval–Vega submitted reply memoranda in response to the government's submissions. Oral argument on defendant Archeval–Vega's objections to the reports and recommendations, and his appeal of the disqualification order was heard by this Court on November 15, 1994.

■ With regard to Magistrate Judge Foschio's disqualification decision dated July 8, 1994, this Court may reverse the Magistrate Judge only if his Order is "clearly erroneous or contrary to law." *See* 28 U.S.C. § 636(b)(1)(A).

After reviewing the submissions of the parties and hearing argument from counsel, the Court finds that the Magistrate Judge's decision and order of July 8, 1994 was neither clearly erroneous nor contrary to law and must, therefore, be affirmed.

Pursuant to 28 U.S.C. § 636(b)(1)(B), the Court must make a *de novo* determination of those portions of the August 31, 1994 Report and Recommendation, and the September 2, 1994 Report and Recommendation to which objections have been made. Upon a *de novo* review of both of those Reports and Recommendations, and the record in this case, and after reviewing the submissions of the parties and hearing argument from counsel, the Court adopts the proposed findings of both the August 31, 1994 Report and Recommendation and the September 2, 1994 Report and Recommendation.

Accordingly, for the reasons set forth in Magistrate Judge Foschio's August 31, 1994 Report and Recommendation, and September 2, 1994 Report and Recommendation,

defendant Archeval–Vega's motion for suppression is denied and his motion for discovery and a factfinding hearing on the issue of race as a determining factor in the stop and questioning of travelers at transportation centers is also denied. Counsel is hereby directed to appear in this Court on December 9, 1994 at 9:00 a.m. for the purpose of setting a date for trial.

IT IS SO ORDERED.

## REPORT AND RECOMMENDATION

FOSCHIO, United States Magistrate Judge.

### *JURISDICTION*

This matter was referred to the undersigned by the Hon. Richard J. Arcara on October 19, 1992, for disposition of all pretrial matters pursuant to 28 U.S.C. § 636(b)(1)(A) and for report and recommendation pursuant to § 636(b)(1)(B). It is presently before the court on the Defendant's motion to suppress statements and physical evidence based on alleged violations of the Fourth Amendment. The Defendant's motion to suppress, based on the racially-motivated behavior of the agents in stopping travellers of non-caucasian origin, will be addressed in a forthcoming Report and Recommendation following further proceedings as may be required. The Defendant's motions for a bill of particulars and other pretrial disclosure is addressed in a separate Decision and Order.

### *BACKGROUND*

Archeval–Vega was charged, in an Indictment dated October 2, 1992, with the violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A) and 846. Specifically, he was accused, between September 1 and 19, 1992, of conspiracy to possess with intent to distribute 50 grams or more of a substance containing cocaine base. In an omnibus motion filed November 16, 1992, Archeval–Vega sought pretrial discovery, a bill of particulars, disclosure of evidence pursuant to Rules 404(b), 608 and 609 of the Federal Rules of Evidence, the preservation of rough notes and other evidence, disclosure of witness statements and sentencing guideline information,

and the suppression of statements and tangible evidence. The Government filed its response to the motion on November 30, 1992, and acknowledged the necessity for an evidentiary hearing. Additionally, the Government opposed the defense request for "all data, information and statistics regarding the number of individuals stopped and questioned by DEA agents in Buffalo transportation centers ... in the last five years...." *See* Defendant's Notice of Motion, filed November 16, 1992, at 12; Government's Response, filed November 30, 1992, at 3–4.

A suppression hearing was conducted before this court on December 8, 1992 and January 15, 1993. The Government presented the testimony of United States Border Patrol Agent William C. Spencer, Jr., Thomas Gerace, a police officer with the Niagara Frontier Transportation Authority assigned to the Drug Enforcement Administration (DEA) Task Force, and Border Patrol Agent Scott Van Tine. A Spanish-language Advice of Rights card was admitted into evidence as Gov't Exh. 3.

Memoranda of Law were filed by the Defendant on April 15, 1993, and by the Government on July 2, 1993. On April 21, 1993, the Government filed a motion for bail revocation on the basis of the Defendant's failure to comply with the conditions of his pretrial release based upon the Defendant's having failed to report to Pre–Trial Services in the Southern District of New York as directed.[1] That motion was granted on April 29, 1993. Oral argument was heard on the suppression motion on July 22, 1993.

On November 29, 1993, Archeval–Vega filed a notice of motion renewing his previous motion for discovery and a fact-finding hearing on the issue of race as a determining factor in the stop and questioning of travellers at transportation centers. The Government filed its response on December 17, 1993, opposing the relief requested.

On January 10, 1994, the Government filed a motion for disqualification of Archeval–Vega's attorney, the Federal Public Defender's Office. On February 1, 1994, Kimberly A. Schechter, Esq., attorney for codefendant Joselin Ramirez, filed an affirmation joining in the Government's motion. On February 17, 1994, Federal Public Defender Jonathan W. Feldman filed an affirmation in response to the Government's motion for disqualification. Oral argument on the motion was held on February 25, 1994. By order filed July 8, 1994, this court granted the Government's motion to disqualify the Federal Public Defender. The court subsequently, on August 1, 1994, assigned Jonathan Johnson, Esq. to represent Archeval–Vega.

For the reasons that follow, the motion to suppress on Fourth Amendment grounds should be DENIED.

### FACTS

Agent Spencer testified that on September 18, 1992, he was assigned to the Exchange Street train station in Buffalo. (T.I.17).[2] Agent Spencer had been alerted, by agents riding the train to Buffalo, that certain individuals would be exiting the train at Buffalo. (T.I.20). The agents were riding the train as part of "Operation Conductor," "a week long event to observe persons on the train and possibly see a conspiracy ... or maybe even pick up an attitude of someone that might be deserving to be spoken with." (T.I.20–21). The agents on the train notified Agent Spencer by radio that two persons, a man and a woman, of apparently Hispanic descent had been riding the train, seated together conversing, that the woman asked the conductor if they had arrived in Buffalo, and that the two then separated before the train approached Buffalo. (T.I.21–22).

At approximately 9:30 pm, Agent Spencer observed the Defendant disembark from the train. (T.I.19). He approached Archeval–Vega, before he entered the station, and asked if he could ask him a few questions. (T.I.24, 32). Archeval–Vega said that he did not mind and, in response to the agent's questions, told the agent his name and place

---

1. Archeval–Vega was subsequently apprehended and, based upon the order revoking bail, returned to custody in this district.

2. "T" references are to the two volumes of the transcript of the suppression hearing conducted by this court on December 8, 1992 and January 15, 1993.

of birth. (T.I.25). Archeval–Vega then produced an identification card, and told the agent that he had spent most of his life in New York City. (T.I.26). Agent Spencer then asked Archeval–Vega the purpose of his trip to Buffalo, and Archeval–Vega said that he was visiting a friend. (T.I.26). He did not know the friend's name, but gave an address of 519 Swan Street, and said that he planned to take a taxi to the address. (T.I.26–27). Agent Spencer questioned Archeval–Vega in English, and the Defendant responded in broken English. Agent Spencer testified that he did not have the impression that Archeval–Vega could not understand him. (T.I.28).

Agent Spencer testified that he asked Archeval–Vega if he would mind waiting while he "made some checks." (T.I.29). Archeval–Vega said that he would wait, and Agent Spencer used his radio to request an check of the Defendant's identity in the Immigration and Naturalization Service (INS) computer. (T.I.29). Archeval–Vega's name produced a negative response, meaning that he was either an American citizen, or was an illegal alien who had never before been apprehended. (T.I.30).

While Agent Spencer was checking with INS, Agent Tom Gerace had approached Archeval–Vega, identified himself as a DEA agent, and asked if he could check Archeval–Vega's bags for illegal drugs. (T.I.31). Archeval–Vega said that he did not mind, set his bags on the pavement, opened them and, at Agent Gerace's request, stepped back. (T.I.31).

Agent Spencer testified that, after the immigration status check, he returned the identification card to Archeval–Vega. (T.I.33). About two or three minutes had elapsed between the time that Agent Spencer first approached him, and the time that Agent Gerace approached Archeval–Vega. (T.I.33). As Agent Gerace finished checking the bags, he asked Archeval–Vega if he knew the woman, later identified as Joselin Ramirez, who was then standing about twenty feet away, outside the train station carrying a bag, while being questioned by other agents. (T.I.34–

35). Archeval–Vega replied that he did not. (T.I.35).

While Agent Spencer was engaged in conversation with Archeval–Vega, Agents Franz and Torre approached Ramirez. (T.I.36). After checking Archeval–Vega's bags, Agent Gerace also proceeded to speak with Ramirez. (T.I.36). Agent Spencer stayed with the Defendant, who did not ask if he could leave, nor did Agent Spencer tell him he was free to leave. (T.I.37–39). Agent Spencer again asked Archeval–Vega if he knew Ramirez, and Archeval–Vega said that he had never before seen her. (T.I.39).

About fifteen minutes after the time that Agent Gerace finished checking Archeval–Vega's bags, agents arrived with a drug-detecting dog. (T.I.41). Agent Spencer observed that the dog alerted at Ramirez's bag. (T.I.42). Spencer watched as Agent Gerace searched Ramirez's bag, found what appeared to be contraband, and advised her of her *Miranda* rights. (T.I.44). Two or three minutes elapsed from the time the dog alerted to the bag. (T.I.46). Agent Gerace nodded to Agent Spencer, and Agent Spencer then advised Archeval–Vega that he was under arrest based on his connection with Ramirez. (T.I.46).[3]

Agent Spencer testified that Archeval–Vega was frisked for a weapon, handcuffed and taken to a Border Patrol vehicle for transport to the DEA office. (T.I.48–49). In the vehicle, Agent Spencer advised Archeval–Vega of his *Miranda* rights in English. (T.I.50). Later, at the DEA office, Agent Van Tine advised him of his rights in Spanish. (T.I.50). Archeval–Vega again denied that he travelled with or knew Ramirez. (T.I.51). Simultaneously, Ramirez was being questioned by DEA agents, and told them that she was with Archeval–Vega, and that they were both being paid $800 to deliver cocaine. (T.I.52). Archeval–Vega later told Agent Spencer that he may have seen Ramirez on the streets of New York City, but denied knowing her. (T.I.52).

On cross-examination, Agent Spencer stated that Archeval–Vega was not free to leave

---

**3.** Ramirez subsequently pleaded guilty to a felony narcotics violation pursuant to a plea agreement with the Government and is awaiting sentencing.

after he denied that he knew Joselin Ramirez. (T.I.121). The Defendant seemed anxious to leave the area, but Spencer never gave him permission or encouraged him to leave. (T.I.144–145).

Thomas Gerace, a police officer with the Niagara Frontier Transportation Authority assigned to the Drug Enforcement Administration Task Force, testified that on September 18, 1992, he was assigned to the Amtrak station in downtown Buffalo. (T.II.4–5). Agent Gerace observed Archeval–Vega exit the train from New York City at approximately 9:30 pm, and be approached by two Border Patrol agents. (T.II.6). Agent Gerace testified that he conferred with Agent Brad Morris, who had been on the train, and was told that Archeval–Vega and Ramirez were the people on the train about whom the agents had previously sent a radio transmission. (T.II.12–13).

Agent Gerace testified that, while Agent Spencer was running an immigration check on the Defendant, he approached, identified himself and asked if he could look through Archeval–Vega's bags. (T.II.7). Archeval–Vega consented, and seemed to understand the question, although Agent Gerace spoke in English. (T.II.8–9). Agent Gerace testified that Archeval–Vega placed his bags on the ground. One bag was a plastic shopping bag, and the other was a duffle-type bag with a sports team logo. (T.II.10). Agent Gerace removed items from the bags and, finding no contraband, replaced the items. (T.II.11). He also testified that he asked Archeval–Vega if he knew the woman, subsequently identified as Joselin Ramirez, who was standing a slight distance away. (T.II.12). Archeval–Vega replied that he did not. (T.II.14). Agent Gerace then asked if he could conduct a pat-down. (T.II.15).

When Agent Gerace finished the pat-down and search of Archeval–Vega's bags, he joined his partner with Ramirez. (T.II.16). Ramirez had told Agent Torre that she, like Archeval–Vega, was travelling to a Swan Street address. (T.II.21). A narcotic-detecting dog was brought to the scene and alerted positively to Ramirez's bag. Agent Gerace then opened the bag and found several duct-

taped packages which, in his experience, contained some kind of narcotics. (T.II.17–19).

Scott VanTine, a United States Border Patrol Agent, testified that on September 18, 1992, the Defendant was in custody at the DEA office. (T.II.109). A DEA agent asked VanTine if he would read Archeval–Vega his *Miranda* rights in Spanish. (T.II.110). VanTine read the rights from a card. (T.II.110). He asked Archeval–Vega if he understood the rights, and the Defendant replied that he did. (T.II.115).

### DISCUSSION

**1. The Initial Encounter.**

Archeval–Vega contends that his encounter with the agents ripened into a seizure, for Fourth Amendment purposes, when Agent Spencer took his identification card and stepped away to conduct an immigration check. He argues that any statements or property obtained from him after that point must be suppressed as the fruits of an illegal seizure. The Government contends that the encounter was in all respects consensual, until the time that Archeval–Vega denied knowing Ramirez.

There are three distinct types of encounters between individuals and police, each with different ramifications under the Fourth Amendment. *See United States v. Hooper*, 935 F.2d 484, 490 (2d Cir.), *cert. denied*, 502 U.S. 1015, 112 S.Ct. 663, 116 L.Ed.2d 754 (1991). The first type is a consensual encounter, where the individual agrees to speak with law enforcement personnel. *Hooper*, *supra*. In this type of encounter, the police officer may initiate the contact with the individual without any objective level of suspicion and the encounter is not a seizure implicating the Fourth Amendment. *See United States v. Glover*, 957 F.2d 1004 (2d Cir.1992).

The second type of encounter is based on the standard set forth in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Under *Terry*, a limited investigative stop of an individual may be made if it is based on a "reasonable suspicion supported by articulable facts that criminal activity 'may be afoot'" *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989),

quoting *Terry, supra,* 392 U.S. at 30, 88 S.Ct. at 1884. The standard for determining whether a particular stop is justified by reasonable suspicion is an objective one and is not subjective based upon the views of the detaining officer. *United States v. Nersesian,* 824 F.2d 1294, 1316 (2d Cir.1987), *cert. denied,* 484 U.S. 958, 108 S.Ct. 357, 98 L.Ed.2d 382 (1987). The requisite level of suspicion to make an investigative stop is "considerably less than proof of wrongdoing by a preponderance of the evidence." *United States v. Villegas,* 928 F.2d 512, 516 (2d Cir.1991), *cert. denied,* 502 U.S. 843, 112 S.Ct. 137, 116 L.Ed.2d 104 (1991).

The third type of encounter is a seizure or arrest that must be based on probable cause. This type of seizure directly implicates the Fourth Amendment. *See Glover, supra,* at 1008.

■ "For a mere encounter to be considered a seizure, a substantial showing of force or authority is required." *United States v. Barrios–Moriera,* 872 F.2d 12, 15 (2d Cir.), *cert. denied,* 493 U.S. 953, 110 S.Ct. 364, 107 L.Ed.2d 350 (1989). Here, there is nothing in the record to indicate that the initial encounter of the Defendant was a seizure implicating the Fourth Amendment. Archeval–Vega was approached by two agents and was asked if they could speak with him. No weapons were drawn and a conversational tone was used by the agents. Archeval–Vega produced what appeared to be an identification card, and Agent Spencer asked if he could run a check. Archeval–Vega agreed, and Agent Spencer took a few steps away to conduct a radio check. The court does not find that the encounter ripened into a seizure at this point. The identification was not confiscated for an inordinately long time. Agent Spencer conducted the check, which took only two or three minutes, found that it came back negative, and promptly returned the card to Archeval–Vega. As a United States Border Patrol Agent, Spencer had a legal right to stop Archeval–Vega and make reasonable inquiry to ascertain his citizenship or immigration status. *See United States v. Brignoni–Ponce,* 422 U.S. 873, 881–82, 95 S.Ct. 2574, 2580–81, 45 L.Ed.2d 607 (1975).

■ Thereafter, the agents requested permission to search Archeval–Vega's bags and to conduct a pat-down search. The Defendant responded in English, appeared to understand the agents' inquiries, and consented to the searches. Considering all the circumstances, this encounter was not so coercive as to communicate to the Defendant that he was not free to leave. *See, e.g., Florida v. Bostick,* 501 U.S. 429, 431, 111 S.Ct. 2382, 2384–85, 115 L.Ed.2d 389 (1991) (no seizure where two officers boarded bus, identified themselves as narcotics agents, questioned defendant, inspected his ticket and identification, and requested consent to search bags); *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (no seizure where two agents approached defendant on public concourse of airport, identified themselves, requested to see identification and tickets, and questioned her); *United States v. Hooper, supra,* at 492 (no seizure where agents approached defendant in airport, asked if he was carrying contraband and if they could run suitcase through magnetometer); *United States v. Delgado,* 797 F.Supp. 213, 217 (W.D.N.Y. 1991) (no seizure where visibly armed agent approached defendant, questioned him regarding citizenship and asked for identification). Accordingly, the court finds that the encounter, up to this point, was consensual and did not implicate the Fourth Amendment.

### 2. The Detention of the Defendant.

The Agents testified that the encounter with Archeval–Vega ripened into a seizure when Archeval–Vega denied that he knew Ramirez. At that point, Agent Spencer determined that Archeval–Vega should not be allowed to leave until the agents could further investigate Ramirez and ascertain the relationship between her and the Defendant. This determination was the result of a reasonable suspicion based on the following articulable facts: the defendant had been observed travelling with Ramirez from Syracuse until the Depew train station, the two individuals then appeared to intentionally separate to give the appearance that they were not travelling together, the defendant

claimed that he was visiting a friend, but did not know the friend's name, both the Defendant and Ramirez gave as their destination an address on the 500 block of Swan Street in Buffalo, and when the agents asked Defendant if he knew Ramirez, Archeval–Vega denied knowing her.

Based on the above facts, the court concludes that the agents possessed a "reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,'" see Sokolow, supra, and that Archeval–Vega and Ramirez may have been involved in a conspiracy to deliver drugs into the Buffalo area. Furthermore, the officers undertook an investigative method that was the "least intrusive means available to verify or dispel the officer's suspicions in a short period of time." See Florida v. Royer, 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983). Here, the agents knew that a narcotics-detecting canine was en route to the Exchange Street station, and would arrive in approximately fifteen minutes. The court finds that the temporary detention of the Defendant, while the dog was brought to the station, was based on reasonable suspicion and was the least intrusive means available to confirm or dispel the agents suspicions. The detention of approximately fifteen minutes was properly within the scope of a Terry stop. See Glover, supra (detention of approximately thirty minutes for narcotics investigation acceptable under Terry); see also United States v. Sullivan, 903 F.2d 1093, 1097–98 (7th Cir.1990) (forty-five minute detention of luggage for canine sniff held reasonable).

### 3. The Arrest.

The court finds that the arrest of the Defendant, after the canine positively alerted to Ramirez's bag and the agents found the contraband, was based on probable cause. Probable cause is "reasonably trustworthy information to justify a person of reasonable caution in believing that an offense has been or is being committed by a the person to be arrested." United States v. Patrick, 899 F.2d 169, 171 (2d Cir.1990). Here, the agents knew that the Defendant had been seated with and conversing with Ramirez on

the train from at least Syracuse, New York, and that the train had originated in New York City, a source city for narcotics. As the train approached Buffalo, Archeval–Vega and Ramirez separated, apparently to give the impression that they were not together. When stopped, Archeval–Vega said that he was visiting a friend, but could not provide the friend's name. He denied knowing Ramirez, yet they each gave their destination as an address in the 500 block of Swan Street in Buffalo.

Contrary to the Defendant's argument, the agents did not arrest the Defendant based solely on the fact that Archeval–Vega was seen sitting beside Ramirez on the train. The discovery of drugs in Ramirez's bag revealed evidence of the crime previously suspected and transformed the agents' reasonable suspicion into probable cause for arrest. See United States v. Ceballos, 719 F.Supp 119, 127 (E.D.N.Y.1989) (reasonable suspicion ripened into probable cause upon discovery of drugs). Additionally, it was reasonable for the agents to believe that Archeval–Vega was travelling with Ramirez, given their observations. Accordingly, the court finds that Archeval–Vega's arrest was based on probable cause.

### 4. The Defendant's Statements.

The Defendant contends that all post-arrest statements he made should be suppressed as there is no evidence that he waived his Miranda rights and agreed to speak with the agents. The Government contends that the Defendant was twice advised of his rights, first in English while he was being transported to the DEA office, and again in Spanish at the DEA office, and voluntarily waived those rights.

The statements at issue are the Defendant's statements to the effect that he did not know Joselin Ramirez, and his later statement, at the DEA office, that he may have seen Ramirez on the streets of New York City. It is fundamental that the Government may not use statements which are the product of custodial interrogation unless it is demonstrated that the accused has been advised of his rights as articulated in Miranda v. Arizona, 384 U.S. 436, 444, 86 S.Ct.

1602, 1612, 16 L.Ed.2d 694 (1966), and has voluntarily elected to waive those rights. It is the Government's burden to show by a preponderance of the evidence that any such waiver was knowing, voluntary and intelligent. *See North Carolina v. Butler*, 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979). The court must consider all the relevant circumstances, including the characteristics of the accused, *i.e.*, the experience of the defendant with law enforcement procedures, the conditions of interrogation, and the conduct of law enforcement officials conducting the interrogation. *See United States v. Anderson*, 929 F.2d 96, 99 (2d Cir.1991).

■ When Archeval–Vega first stated he did not know Ramirez, he made the statement in the course of a consensual, noncustodial encounter, and the administration of *Miranda* warnings was not required. *See Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977). During the limited detention of Archeval–Vega while awaiting the arrival of the dog, Agent Spencer again asked the Defendant if he knew Ramirez, and Archeval–Vega denied it. At this point, Archeval–Vega had not been formally arrested, but there was a significant restraint on his freedom of movement such that he would not have been allowed to leave. Under these circumstances, Archeval–Vega should have been advised of *Miranda* warnings prior to any further interrogation. *See California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983). His statement, in response to Agent Spencer's single question, is suppressible, yet suppression of the statement carries no legal significance, as it is merely a repetition of the earlier admissible statement.

■ Following his formal arrest, the record indicates that Archeval–Vega was advised of his rights, both in Spanish and in English. Although there is no evidence of an express waiver of rights, such an express waiver is not required to find that a defendant has waived his rights. *See United*

States v. Spencer, 955 F.2d 814, 819 (2d Cir.1992); *United States v. Scarpa*, 897 F.2d 63, 68 (2d Cir.), *cert. denied*, 498 U.S. 816, 111 S.Ct. 57, 112 L.Ed.2d 32 (1990). The record indicates that Archeval–Vega never asserted his rights or requested an attorney. Moreover, the earlier unwarned statement does not taint the later statements made at the DEA headquarters. "A suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings." *Oregon v. Elstad*, 470 U.S. 298, 318, 105 S.Ct. 1285, 1298, 84 L.Ed.2d 222 (1985). There is no indication that the questioning at the DEA office was coercive, and Archeval–Vega's statements, that he did not know Ramirez, are consistent with his earlier statement, made before he was taken into custody.[4] Accordingly, the court concludes that Archeval–Vega's waiver of his rights was voluntary, and the motion to suppress statements should be DENIED.

## 5. Standing to Contest the Search of Ramirez's Bag.

■ No narcotics were seized from the property or person of Archeval–Vega. He contends, however, that he has standing to contest the search and seizure of narcotics from the bag of Joselin Ramirez. Based on the Supreme Court's holding in *United States v. Padilla*, —— U.S. ——, 113 S.Ct. 1936, 123 L.Ed.2d 635 (1993), that no "joint-venture" or "co-conspirator" basis for standing is recognized, this challenge must fail. Fourth Amendment rights are personal, and may not be vicariously asserted. *Padilla*, *supra*, at ——, 113 S.Ct. at 1939; *see also Rakas v. Illinois*, 439 U.S. 128, 133, 99 S.Ct. 421, 425, 58 L.Ed.2d 387 (1978). For example, a defendant's Fourth Amendment rights are not violated when he conceals contraband in the property of another and that property is subsequently searched, unless he has a reasonable expectation of privacy in the property of the person which was searched.

---

4. At the suppression hearing, defense counsel questioned Agent Gerace at length about a meeting between the Defendant and the agents at the DEA office in which Ramirez acted as an interpreter. (T.II.73–94). Following the questioning, it was determined by the court and counsel that the Defendant made no statements at this meeting that would be subject to suppression. (T.II.94).

*See Rawlings v. Kentucky,* 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980).

Here, Archeval–Vega asserts no privacy interest in the bag. The only asserted basis for standing is the now-overruled co-conspirator concept. Accordingly, the court finds that Archeval–Vega has no standing to contest the search and seizure of narcotics in Ramirez's bag.

### CONCLUSION

Based on the foregoing analysis, it is recommended that the motion to suppress statements and evidence be DENIED.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of receipt of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 30(a).

***Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.*** *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir.1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Government and the Defendant.

SO ORDERED.

DATED: August 31st, 1994

Buffalo, New York.

### REPORT AND RECOMMENDATION

#### JURISDICTION

This matter was referred to the undersigned by the Hon. Richard J. Arcara on October 19, 1992, for disposition of all pretrial matters pursuant to 28 U.S.C. § 636(b)(1)(A) and for report and recommendation pursuant to § 636(b)(1)(B). It is presently before the court on the Defendant's motion to suppress, based on the asserted racially-motivated behavior of the agents in stopping travellers of non-caucasian origin, and the Defendant's requests for discovery of statistical data and a fact-finding hearing. The Defendant's motions to suppress based on the Fourth Amendment and for a bill of particulars and other pretrial disclosure are addressed in a separate Decision and Order and Report and Recommendation dated August 31, 1994.

### BACKGROUND AND FACTS

Archeval–Vega was charged, in an Indictment dated October 2, 1992, with the violation of 21 U.S.C. § 841(a)(1), 841(b)(1)(A) and 846. Specifically, he was accused, between September 1 and 19, 1992, of conspiracy to possess with intent to distribute 50 grams or more of a substance containing cocaine base. In an omnibus motion filed November 16, 1992, Archeval–Vega sought pretrial discovery, a bill of particulars, disclosure of evidence pursuant to Rules 404(b), 608 and 609 of the Federal Rules of Evidence, the preservation of rough notes and other evidence, disclosure of witness statements and sentencing guideline information, and the suppression of statements and tangible evidence. The Government filed its response to the motion on November 30, 1992, and acknowledged the necessity for an evidentiary hearing. Additionally, the Government opposed the defense request for "all data, information and statistics regarding the number of individuals stopped and questioned by DEA agents in Buffalo transportation centers ... in the last five years...." *See* Defendant's Notice of Motion, filed November 16, 1992, at 12; Government's Response, filed November 30, 1992, at 3–4.

A suppression hearing was conducted before this court on December 8, 1992 and January 15, 1993. The Government presented the testimony of United States Border Patrol Agent William C. Spencer, Jr., Thomas Gerace, a police officer with the Niagara Frontier Transportation Authority assigned to the Drug Enforcement Administration (DEA) Task Force, and Border Patrol Agent

Scott Van Tine. A Spanish-language Advice of Rights card was admitted into evidence as Gov't Exh. 3.

Memoranda of Law were filed by the Defendant on April 15, 1993, and by the Government on July 2, 1993. On April 21, 1993, the Government filed a motion for bail revocation on the basis of the Defendant's failure to comply with the conditions of his pretrial release based upon the Defendant's having failed to report to Pre–Trial Services in the Southern District of New York as directed.[1] That motion was granted on April 29, 1993. Oral argument was heard on the suppression motion on July 22, 1993.

On November 29, 1993, Archeval–Vega filed a notice of motion renewing his previous motion for discovery and a fact-finding hearing on the issue of race as a determining factor in the stop and questioning of travellers at transportation centers. The Government filed its response on December 17, 1993, opposing the relief requested.

On January 10, 1994, the Government filed a motion for disqualification of Archeval–Vega's attorney, the Federal Public Defender's Office. On February 1, 1994, Kimberly A. Schechter, Esq., attorney for codefendant Joselin Ramirez, filed an affirmation joining in the Government's motion. On February 17, 1994, Federal Public Defender Jonathan W. Feldman filed an affirmation in response to the Government's motion for disqualification. Oral argument on the motion was held on February 25, 1994. By order filed July 8, 1994, this court granted the Government's motion to disqualify the Federal Public Defender. The court subsequently, on August 1, 1994, assigned Jonathan Johnsen, Esq. to represent Archeval–Vega.

In a Report and Recommendation dated August 31, 1994, this court recommended that the motion to suppress be denied, finding that the initial encounter between Agent Spencer and the Defendant was a consensual one which, upon the agents' gaining reasonable suspicion that Archeval–Vega was involved in a conspiracy to bring narcotics into the area with Joselin Ramirez, ripened into a *Terry*-type stop, followed by Archeval–Vega's arrest based on probable cause.

## DISCUSSION

### 1. Request for Disclosure of Statistical Data

 The defense has requested any and all statistical information regarding the racial and ethnic identity of individuals stopped and/or arrested for narcotics related activities at Buffalo area transportation centers, statistical information regarding the racial and ethnic identity of individuals prosecuted for narcotics related offenses at the transportation centers, manuals, handbooks or other documents containing policies or practices of federal law enforcement personnel regarding traveller profiles and engaging travellers for consensual stops and searches, and documents and directives regarding Operation Conductor and other similar drug interdiction efforts. *See* Defendant's Motion, filed November 29, 1993, at 6–8.

In response, the Government represents that it "is unaware of any physical or statistical segregation that occurs among the investigating agencies and is further unaware of any statistical tracking for transportation center cases at the United States Attorney's Office." *See* Government's Response, filed December 17, 1993, at 9. Further, the Government stated in response that it is unaware of any published information containing policies or practices in the United States Attorney's Office "or any office on the federal level" which identify or distinguish transportation center cases from any other investigation or prosecution. *See* Government Response, *supra.*

The court has reviewed the discovery requests, and concludes that such disclosure is unwarranted. At the evidentiary hearing on the Defendant's suppression motion, Agent Spencer of the United States Border Patrol testified that his agency keeps no records of consensual encounters that do not result in arrest and prosecution, and that there were no specific written directives regarding Oper-

---

1. Archeval–Vega was subsequently apprehended and, based upon the order revoking bail, re-

turned to custody in this district.

ation Conductor. While the United States Attorney's Office and the Justice Department most surely keep records of prosecutions and convictions, the court accepts the Government's representation that such statistics are not kept by type of case, *i.e.,* "transportation center" cases, or "stop and inquire" cases. Additionally, the court is unconvinced that any such further discovery would shed any light on the issues in this case. Having heard the testimony of the agents, the court has concluded that race played no part in the stop of the Defendant and Ramirez at the train station.

In *United States v. Travis,* 837 F.Supp. 1386 (E.D.Ky.1993), the court held that a consensual encounter may not be initiated solely on the basis of race, and requested statistical data on the racial makeup of air travellers generally, and the racial makeup of air travellers approached by law enforcement officers, to determine whether minority travellers were approached in disproportionate numbers when compared with white travellers. If the defendant produced statistical evidence of such a disparate impact, the burden would shift to the Government to rebut the presumption of unconstitutional action or to identify a compelling government interest for the disparate impact. *Travis, supra,* at 1395. In *Travis,* such a disparate impact was shown, but the court concluded that the Government sustained its burden of justifying the consensual encounter with the defendant by the use of drug courier profile characteristics and law enforcement information concerning the use of African–American and Hispanic female drug couriers on flights from Los Angeles.

Considering the factual circumstances of this case, the court is convinced, assuming *arguendo* that statistical evidence of a disparate impact could be provided, it would not result in suppression in this case. Even if the court were to order discovery of relevant statistical information, the existence of which has not been established by the Defendant as is his burden, *see Travis, supra,* at 1395, and the Defendant were able to present, based upon acceptable statistical analysis, a *prima facie* case of disproportionate impact on minority travellers, the burden would then shift to the Government to rebut the presumption of unconstitutional action, or to identify a compelling government interest for the disparate impact. *See United States v. Travis, supra.* The Government has already put on its proof in this regard, and has sustained its burden and rebutted any possible presumption of unconstitutionality by showing race-neutral reasons for the encounter with the Defendant. As there is no reason to believe the requested statistical data exists, and given that the suppression hearing record shows that Defendant's race was not a motivating factor in the investigator's decision to stop him, the request for further discovery will be futile and is therefore DENIED. A finding of race-neutral grounds for the encounter renders consideration of alleged due process or equal protection claims unnecessary. *See United States v. Taylor,* 956 F.2d 572, 579 (6th Cir.1992).

### 2. *Request for a Fact–Finding Hearing*

Archeval–Vega has requested a fact-finding hearing to demonstrate *prima facie* that race was the determining factor in the decision to stop and engage the Defendant at the Exchange Street train station on September 18, 1992. He argues that, "[s]hould the court determine that the defendant was selected for 'engagement' because of his race, the Indictment now pending against him must be dismissed as obtained and based upon violations of the defendant's constitutional right to equal protection and due process." *See* Defendant's Motion, filed November 29, 1993, at 6. The Defendant does not suggest what evidence he would seek to introduce at this fact-finding hearing, but the court assumes that he would offer the testimony of Professor Rosalyn A. Lindner, Chair of the Department of Sociology at the State University of New York College at Buffalo, who provided an affidavit in support of the motion and is prepared "to testify as to statistical studies" on the issue of the disparate treatment of minorities in the so-called "war on drugs," and her opinion that "race was most likely, in and of itself, the primary determinant in the decision to stop and encounter the defendant." *See* Lindner Affidavit, Defendant's Motion, filed November 29, 1993, Exhibit A, at 3, 10.

The court has previously conducted an evidentiary hearing on the circumstances of the stop in this case, and has determined that Archeval–Vega was approached by Agent Spencer based on the radio transmission from Border Patrol Agent Palacios, who was present on the train and observed codefendants, Archeval–Vega and Joselin Ramirez, engaged in suspicious behavior. Specifically, Archeval–Vega and Ramirez sat together and conversed for a lengthy period of time and, as the train approached Buffalo, the two separated as if to give the impression that they were not together. The agent testified that, based on his experience, this behavior is consistent with that of "mules," or couriers, employed by narcotics traffickers to deliver drugs.

The court concludes that a further fact-finding hearing is unnecessary, as it has already determined that the Defendant was not selected for further investigation upon arrival in Buffalo based on his race. That record demonstrates, rather, that Archeval–Vega and Ramirez were approached for further investigation not because of their color but because of their conduct. *See Travis, supra,* at 1395. The court has reviewed the affidavit of Professor Lindner, and concludes that it provides no information which would cause the court to change its previous factual findings. Moreover, there is no indication that competent data on the issue of racially motivated stops by government agents at train stations in general, or the Amtrak Exchange Street station in particular, is available or can be made available. Absent such competent data, the court fails to see how competent statistical analysis and conclusions can be made. Accordingly, the request for a further evidentiary hearing is DENIED.

### 3. *The Motion to Suppress*

Having previously found that the stop of Archeval–Vega was not impermissibly based solely on his race, but rather on the agents' observations of suspicious behavior, the court concludes that suppression based on racial bias of the agents is unwarranted. Moreover, the Defendant has provided nothing in his papers that would suggest a racially discriminatory motive on the part of the agents

in this case warranting further fact-finding or a reversal of the court's previous factual conclusions. Additionally, the court concludes that, even if the Defendant were able to make a *prima facie* showing of a disparate impact on minority travellers, the Government has rebutted the presumption of unconstitutional action by showing the race-neutral reasons for the stop. Accordingly, the motion to suppress based on racial bias should be DENIED.

### *CONCLUSION*

Based on the foregoing analysis, the requests for discovery and a hearing are DENIED, and it is recommended that the motion to suppress on the grounds of racial bias be DENIED.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of receipt of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 30(a).

*Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order. Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir.1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Government and the Defendant.

SO ORDERED.

DATED: September 2nd, 1994

Buffalo, New York.